# UNITED STATES *v.* ST. LOUIS & MISSISSIPPI VALLEY TRANSPORTATION COMPANY.

## APPEAL FROM THE COURT OF CLAIMS.

No. 89.  Argued January 10, 13, 1902.—Decided February 24, 1902.

After the findings of fact, conclusions of law, and judgment in this case were filed, two successive motions for a new trial were made on behalf of defendant; whereupon the former findings were withdrawn, and new and amended findings and opinion filed. *Held,* that as these amendments were made at defendant's request, the existing conclusions of law and judgment were not thereby disturbed.

The evidence adduced shows that the facts found were sufficient to warrant the court below in holding that the collision in the Mississippi River at New Orleans, whereby the Transportation Company lost a vessel, was the result of the negligence of the officers in command of the United States vessels.

There was also culpable negligence in the United States officers in anchoring in an unusual and improper position.

Upon the findings made the Transportation Company was not chargeable with contributory negligence.

On October 17, 1894, the St. Louis and Mississippi Valley Transportation Company filed in the Court of Claims a suit by way of petition against the United States, in pursuance of the provisions of the act of August 3, 1894, alleging that said company was a corporation of the State of Missouri, and the owner

of the towboat Future City, her barges in tow and freight earnings; that owing to a collision on May 5, 1888, in the Mississippi River, between said steam towboat and barges and war vessels of the United States, several of the barges, with their cargoes and contents, were sunk and wholly lost, and the freight earnings of such barges for the voyage in progress were lost, or not earned and paid to the claimant; and that said collision and the loss and injury resulting therefrom were solely and directly the result of negligence on the part of those in charge of the said vessels of war; and claimed damages in the sum of $24,308.

The United States appeared in said Court of Claims by its Attorney General, and filed an answer traversing and denying the allegations of the claimant's petition. The case was so proceeded in that on March 21, 1898, the court found for the claimant, and adjudged and decreed that the St. Louis and Mississippi Valley Transportation Company should have and recover of and from the United States the sum of $19,808.85.

On March 21, 1898, the court filed findings of fact and conclusion of law. Subsequently, to wit, on May 14, 1900, the court filed an order withdrawing its former findings of fact in this case, and filed amended findings in lieu thereof.

On May 21, 1900, an appeal was prayed for and allowed to this court.

*Mr. George Hines Gorman* for appellant. *Mr. Assistant Attorney General Pradt* was on his brief.

*Mr. James H. Hayden* for appellee. *Joseph H. McCammon* was on his brief.

MR. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

After the findings of fact, conclusions of law and judgment were filed by the Court of Claims on March 21, 1898, two successive motions for a new trial were made on behalf of the defendant. The result of these motions was that on May 14,

1900, the court filed an order withdrawing its former findings of fact, and filed new and amended findings and opinion; and it is now contended that by such action in amending its findings of fact and modifying its opinion the court must be deemed to have set aside its judgment. But as the amendments of the findings were made at the request of the defendant in connection with the motions for a new trial, we think that the existing conclusions of law and judgment were not thereby disturbed. Obviously the changes or modifications in the findings, at the instance of the defendant, were intended by the court to enable the case of the defendant to be most advantageously presented for review by the court below on the motions for a new trial, and by this court on appeal. The motions for a new trial having been overruled, the judgment rendered on March 21, 1898, remained as the judgment of the Court of Claims, and that is the judgment from which the defendant appealed, and which is now before us for review. By taking such appeal, the defendant must be deemed to have admitted the existence and finality of the judgment. Nor is it perceived that the defendant has any reason to complain that the findings, on which the conclusions of law and the judgment were based, were amended at its instance. So far as the amendments were at all material, they were, in some instances, favorable to the case of the defendant, and, at all events, must be regarded as a proper exercise of authority by the trial court in making its findings conform to the truth, while its record had not passed out of its control by the allowance of an appeal.

The material facts found by the Court of Claims were as follows: The Future City and the barges comprising her tow were all staunch, sound and seaworthy, and were fully and adequately manned, officered and equipped, and the Future City was ample, powerful and able to handle her tow under any and all circumstances arising in the navigation of the Mississippi River. On Mya 7, 1888, the Future City with her tow was descending the river and approaching the port of New Orleans, with the intention of making a landing, and while so descending the river the Future City followed the proper and customary course of navigation for descending towboats with tows. A towboat

with a tow bound for the port of New Orleans, and pursuing the proper and customary course for such vessels, cannot make out and see vessels and other objects lying in that portion of the river below a point of land at Celeste street and between the western shore and the middle of the stream, because that point and the buildings standing upon it, and the shipping moored along its banks, intervene and completely shut off the view in that direction.

Upon rounding the point of land at Celeste street the Future City for the first time sighted five United States vessels, to wit, the Atlanta, Galena, Ossipee, Yantic and Richmond, lying at anchor below the said point of land and between the western bank of the river and the middle of the stream. The Future City could not have made out and discovered the United States vessels before, because the said point of land intervened and, with the buildings upon it and the shipping moored along its banks, completely shut off the view in the direction of the portion of the river where those vessels lay at anchor. As soon as she sighted and discovered the United States vessels lying at anchor in her usual and proper course, the Future City backed under a full head, working full stroke, with all the power she had, thus adopting the only course feasible and proper in the circumstances, or in anywise calculated to prevent her from colliding with the United States vessels. On account of the insufficiency of time and space after she discovered the United States vessels, and notwithstanding that she made every possible effort to keep clear of the United States vessels, and, in order that her tow might extend out into the river as short a distance as its length would permit, backed her stern as close to the New Orleans shore as it was in anywise possible without coming into collision with the shipping moored therealong, and notwithstanding that she was skillfully and properly handled and managed by her officers and crew, the Future City was unable, on account of the short distance intervening, either to check her headway or to straighten up, and still being in a flanking position, she and her tow were carried by her headway and the current of the river, and barge 73, the leading barge of her tow on the port side, came into collision with the Atlanta,

striking against the ram of that vessel broadside on with great force.   As a result of this collision barge 73 was cut down, and sank, with all her cargo.

Thereafter, notwithstanding that the Future City continued to pursue the only course feasible and proper in the circumstances and in anywise calculated to avoid further collisions with other of the United States vessels, and continued to back with all her power, and notwithstanding that she was skillfully managed and handled by her officers and crew, yet her stern having been swung slightly down stream by the collision of barge 73 with the Atlanta, she was unable to check her headway or straighten up, and was carried by her headway and the currents of the river, and barge 68, the leading barge on the starboard side, collided with the Galena, and was sunk with all her cargo.   Notwithstanding that the Future City was skillfully and properly handled, and that she and her officers and crew did their utmost to control her remaining barges and to prevent further collisions between them and the United States vessels, barge 50 broke loose and was carried by the current, and came into collision with the Richmond, and thereby sustained great damage and the loss of part of its cargo.

The United States vessels, as they lay at anchor on May 7, 1888, were ranged in an irregular line along the western bank of the river, which is the city side, their distances from said bank varying from 500 to 700 feet.   The Atlanta was anchored highest up stream, and was about 150 feet below the Richard street ferry, and the entire fleet extended down the river for the distance of about one mile—the Richmond lying off and about opposite the barge landing.   At Celeste street the shore extends into the river to a sharp point, and the river bends from that point to the north.   Just below, the width of the stream is about 1800 feet.   The location of the Atlanta, 600 feet, or a little less. from the New Orleans shore, put that vessel in the track of tows entering the harbor from above.   It was in the pathway of a tow of even less length than the plaintiff's, at that particular place engaged in flanking down to the landing. The upper vessel was at the entrance to the harbor, and the fleet was located in the way of all vessels descending and seek-

ing to land in the neighborhood of the barge landing. When the United States vessels were first sighted or discovered by the Future City the Atlanta was distant from her about 150 yards.

The positions occupied by the United States vessels were directly in the track of towboats with tows descending the Mississippi River bound for the port of New Orleans, and pursuing their proper and customary course of navigation, and were thus directly in the track the course of which the Future City and her tow were pursuing when she first sighted and discovered them. The positions thus occupied by the United States vessels were improper and unusual, by reason of their being higher up stream, too short a distance below the point of land at Celeste street, not at the bank, but nearer to the New Orleans or western shore in the river, than the proper, usual and customary anchorage grounds for such or other vessels, or than vessels had ever before been known to occupy while at anchor. By reason of their being anchored so high up the river such short distances below the point of land at Celeste street and so close to the New Orleans shore, and by reason of their swinging at anchor, they rendered the navigation of the river by towboats with tows, pursuing their usual and customary course, hazardous and extremely dangerous. On May 7, 1888, and prior thereto, there was an abundance of good and suitable anchorage ground lower down the river and nearer its eastern or Algiers shore, where it was usual, customary and proper for vessels to lie at anchor while at the port of New Orleans, and where the United States vessels could have lain at anchor in perfect safety and without rendering the navigation of the river at the port of New Orleans either hazardous or dangerous for any vessels pursuing their usual, proper and customary courses. Good holding ground for vessels like the men-of-war to safely anchor at all times existed within twenty feet of the Algiers shore. The United States vessels came to anchor in their said positions on or about May 5, 1888, while the Future City, with her tow, was descending the Mississippi River on her voyage from St. Louis, and none of her officers or crew had notice or knowledge of their presence at New Orleans, or of their whereabouts, or of the manner in which they were anchored, until

they were sighted and discovered after the Future City had rounded the point of land at Celeste street. There is a clear and well-defined custom at New Orleans respecting the course and practice of tows to land. Descending tows come close to the shore on the city side of the river. If they did not pursue this course descending tows would come down in the current so far out that the motive power could not back the tow to land. One of the reasons for coming in close to the shore is to catch the slack near vessels moored to the shore.

Under the laws of the State of Louisiana there existed, at the time of this occurrence, a board of five harbor masters, who were charged with the duty of "regulating and stationing all vessels in the stream of the river Mississippi, within the limits of the port of New Orleans, and at the levees thereof." Among the rules and regulations adopted by the board, and at that time in force, was one prescribing that "the harbor masters have authority by law to regulate, moor and station all seagoing or coasting vessels at the levee, and to remove them from time to time to make room for others, and of the degree of accommodation which one vessel shall afford another the harbor master is constituted sole judge;" and another which provides that "all vessels arriving at this port shall notify the harbor master of the district or leave word at the central office, where the place of landing will be designated; otherwise they will be removed at the expense of the vessel;" and another which declares that "masters of vessels failing to comply with the rules will be held responsible for all damages in consequence, besides laying themselves liable under the law."

Upon the arrival of these United States vessels in May it does not appear that the harbor master was notified of the fact, nor was word left at the central office that the vessels had arrived. The harbor master exercised no personal supervision over the matter of the anchorage of the fleet, and was without knowledge of the places taken in the river by the said war vessels.

The Court of Claims further found, in its twenty-second finding, that "the said collisions were the result of negligence on the part of the officers in command of the United States ves-

sels in bringing them to anchor in improper and unusual positions, and in causing them to be anchored on swinging chains, as aforesaid."

A lengthy discussion is made in the briefs of the respective counsel as to the nature of this finding. Is it a finding of the ultimate fact in the case, or is it merely a conclusion of law based on the facts previously found?

It is said, on the one hand, that, by the express terms of the act of Congress authorizing this suit to be brought, no judgment shall be rendered against the Government unless it shall affirmatively appear, from the evidence adduced, that such collision was the result of negligence on the part of the officers in command of said vessels of war, and that the Court of Claims, having affirmatively found that the collisions were the result of negligence on the part of the officers in command of the United States vessels, such finding is a conclusion of fact, which conclusively disposes of the case, and which, so far as the right to recover is concerned, leaves no question of law to be passed upon by this court. On the other hand, it is claimed that negligence is not a fact which is the subject of direct proof, but an inference from facts put in evidence, and that, hence, this court can determine, from the facts otherwise found, whether the collision was the result of negligence on the part of the officers in command of the vessels.

We do think it necessary to weigh this question in a very delicate balance, as we are of opinion that, even if the Government's contention in that particular is sound, yet the evidence adduced, as it appears in the facts found, was sufficient to warrant the court below in holding that it affirmatively appeared that the collision was the result of the negligence of the officers in command of the vessels.

Undoubtedly, by entering the port of New Orleans, intending to anchor and remain there, in total disregard of the usages and regulations of the port, the officers in command of the vessels were negligent. Ports like those of New Orleans and New York, which are frequented not merely by seagoing vessels, but by numerous vessels and barges engaged in commerce, or

rivers which enter and form part of the harbors, require regulations suited to the local exigencies.

"An ordinance of the city of Charleston, prescribing where a vessel may lie in the harbor, how long she may remain there, what light she must show at night, and making other similar regulations, is not in conflict with any law of Congress regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States. It is therefore valid, and a vessel at anchor is bound to show such a light as is required by the local regulations." *Owners of James Gray* v. *Ship John Fraser*, 21 How. 184; *The Vanderbilt*, 6 Wall. 225.

There was also culpable negligence in anchoring in an unusual and improper position.

"It is negligence for a vessel to moor so near the entrance to a harbor that shipping, entering in stress of weather, is liable to become embarrassed by its presence; and where the usual difficulties of navigation make the entrance to a harbor a dangerous undertaking, it is especially reprehensible for a vessel to moor in a situation tending to increase these difficulties."

"Where a vessel is at anchor in a proper place, and is observant of the precaution required by law, it is not liable for damages sustained by a vessel in motion colliding with it, but where it anchors in an unlawful position, or fails to observe the statutory requirements and such other precautions as good seamanship would suggest, it must suffer the consequences attending a violation of the law." Spencer on Marine Collisions, secs. 99, 106.

"A vessel ought not to be moored, and lie in the channel or entrance to a port, except in cases of necessity; or, if anchored there from necessity, she ought not remain there longer than the necessity continues. If she does and a collision takes place with a vessel entering the harbor, she will be considered in default." *The Scioto*, 2 Ware, 360.

The treatment of the question of negligence on the part of those in command of the Government's vessels was so full and satisfactory by the court below that we think it sufficient to refer to its opinion, reported in 33 C. Cl. 251.

The dissent on the part of Peele, J., did not arise out of any

view that the United States officers had not been negligent, but was based on the opinion of the dissenting justice that negligence on the part of the plaintiff had contributed to the accident.

Adverting to that aspect of the case, we think that, upon the findings made, which of course control us, the plaintiff was not chargeable with contributory negligence. The findings show that the Future City entered the harbor and manœuvered for landing, in the manner customary for vessels of her class; that she had no reason to expect to find vessels at anchor, where none had ever been known to anchor before, on the city side of the river and close under the point at Celeste street, and that her management, when she encountered the exigency, was skillful and proper.

The Court of Claims further found that the damages caused to the plaintiff, as a result of the collisions, amounted to the sum of $19,808.85.

It is contended on behalf of the Government, that, even if the collision was the result of negligence on the part of the officers in command of said vessels of war, and even if, on the facts found, the plaintiff was properly exonerated from the charge of contributory negligence, yet that the judgment of the court below was erroneous in including the loss and damages caused to barge 68.

This contention is based on an alleged difference between the findings of fact filed on March 21, 1898, and those filed on May 14, 1900, whereby, it is claimed, that the facts that were found in the first finding, and upon which the liability of the Government for barge 68 was based, were eliminated, and hence there was no foundation left for the judgment in that respect. This record does not disclose to us the first finding, and, of course, we can only consider the findings as amended and filed on May 14, 1900. But, even conceding that the discrepancies pointed out exist, yet we think that the findings actually and finally made furnish sufficient support for the judgment in the particular complained of. Finding sixteen is explicit, that, " notwithstanding the Future City, after the collision with the Atlanta, continued to pursue the only course feasible and proper

in the circumstances, and in anywise calculated to avoid further collisions with other of the United States vessels, and continued to back with all her power, and notwithstanding that she was skillfully and properly handled and managed by her officers and crew, yet her stern having been swung slightly down stream by the collision of barge 73 with the Atlanta, she was unable to check her headway or straighten up, and was carried by her headway and the currents of the river, and went down toward the Galena, which was lying about 400 feet astern of the Atlanta and closer to the New Orleans shore than the latter. In the collision between barge 68 and the Galena the lines and fastenings of the said tow and the rigging of the Future City were parted or greatly damaged, and her tow was broken up and the lead barge (68), the barge on the starboard side, struck the Galena and was sunk, with all cargo aboard, and the barge and her freight earnings became a total loss."

Inasmuch as the court found that everything that was possible to avert further collisions after the collision with the Atlanta was done by the Future City, it, in effect and indeed in terms, found that the loss of the three barges occasioned by collision with the Atlanta, the Galena and the Richmond, were occasioned by negligence of the officers in command of the said United States vessels, in bringing them to anchor in improper and unusual positions and in causing them to be anchored on swinging chains.

The judgment of the Court of Claims is

*Affirmed.*