## THE EAGLE POINT.

### (District Court, E. D. Pennsylvania. March 7, 1902.)

### No. 73.

1. COLLISION—STEAMERS CROSSING—EXCESSIVE SPEED IN FOG.

In a suit for a collision in the night between the Atlantic steamships Biela and Eagle Point, 150 miles east of Sandy Hook, while on crossing courses, the evidence and surrounding circumstances considered, and *held* to sustain the contention of the Eagle Point that there was a fog at the time and place of collision so dense that the two vessels could not see each other until within 250 yards, and that the Biela was therefore in fault for maintaining full speed and failing to give fog signals.

2. SAME—SPEED PERMISSIBLE IN FOG—"MODERATE SPEED."

Under article 16 of the international navigation rules, which provides that "every vessel shall, in a fog, mist, falling snow or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions," the term "moderate speed" is a relative one and

the time and place and all other circumstances and conditions must be taken into account before judgment can be pronounced on a given rate. Where a vessel with a normal full speed of 12 knots reduced to 8 knots or less in a fog, it will be held a moderate speed, where it is shown without contradiction that, owing to her having little cargo and being very light, she could not be properly controlled at a lower rate of speed.

In Admiralty.  Suit for collision.

Wing, Putnam & Burlingham, for libelant.

Butler, Notman, Joline & Mynderse, for respondents.

J. B. McPHERSON, District Judge.  This is a libel against the British steamship Eagle Point, wherein damages are claimed for a collision that occurred in the early morning of October 1, 1900; the result being that the steamship Biela was sunk, and her cargo was lost.  The facts are as follows:  The collision took place on the Atlantic Ocean, about 150 miles east of Sandy Hook.  The Eagle Point was bound westward from London to Philadelphia.  She is a steamship of 5,222 gross tons, 3,307 net tons, 410 feet in length, 51 feet in breadth, and 31 feet deep.  Her cargo capacity is 7,700 tons dead weight, but upon this voyage she was carrying only 300 tons.  After leaving port she had taken in some water ballast, but most of this had been discharged shortly before the collision took place, and at that time she was drawing about 16 feet.  The Biela was a British steamship of 2,182 gross tons, 1,344 net tons, 316 feet in length, nearly 35 feet in breadth, and about 29 feet in depth. She was bound eastward on a voyage from New York to Liverpool, loaded with a general cargo.  Both vessels were properly manned, equipped, and supplied.  The Biela left New York Sunday morning, September 30th, passing Sandy Hook at 8:45 a. m., and reaching Fire Island light-ship at 1:10 p. m., New York time.  The Eagle Point passed Nantucket Shoals light-ship on Sunday evening about 6:30 or 7 o'clock.  The light-ship was not seen because of a dense fog, but her whistle was heard off the starboard beam, distant apparently about two miles.  The collision took place shortly before, or shortly after, 1 o'clock on Monday morning, October 1st, and the injury to the Biela was so serious that she sank in less than half an hour; her crew and passengers escaping by the boats, and reaching the Eagle Point in safety.  The bow of the Eagle Point was severely damaged, but she was able to proceed upon the voyage, and reached Philadelphia in due course.

There is no substantial dispute concerning the place upon the high seas where the collision occurred, the hour of the collision, nor the courses upon which the vessels were sailing.  It is agreed, also, that the night was dark, wet, and overcast, and that the sea was smooth.  Upon essential matters, however, the respective accounts given by those on board the two vessels are, as might be anticipated, wholly irreconcilable.  These accounts are outlined accurately in the brief of counsel for the claimant:

"The Biela asserts in her libel that the night was 'dark and wet,' but so that lights were readily visible; some of her witnesses claiming that it was starlight and moonlight, and perfectly clear to the southward.  She claims that ten minutes before the collision she discerned the masthead light of

the Eagle Point about three points on the port bow, distant three or four miles; that in about two minutes the green light on the Eagle Point appeared; that the approaching steamer made no change in her course, and that when she was distant about two lengths the Biela, which had been proceeding at full speed, making between nine and ten knots per hour, stopped and reversed her engines, and gave a signal of three blasts, which was answered by the Eagle Point; that while the engines of the Biela were still backing she was struck a terrific blow on her port side by the Eagle Point. The witnesses indicate that the blow was at nearly a right angle.

"The Eagle Point, on her part, asserts that at the time of the collision there was a dense fog, through which she had been running for several hours before the collision, the entire voyage from London having been more or less foggy; that she had reduced her speed to between seven and eight knots, her full speed being nearly twelve knots per hour, and was giving fog signals regularly; that while proceeding through this dense fog the Biela's masthead light was dimly discerned about a point on the starboard bow of the Eagle Point; that the officer in charge of the Eagle Point, then being in the act of sounding the fog signal, gave such signal; that immediately thereupon the red side light of the Biela came into view, distant probably not more than 250 yards, the light being discovered as soon as the character of the light and the density of the fog permitted; that, immediately the wheel of the Eagle Point was put hard a-port, a signal to that effect being given by whistle, the engines of the Eagle Point were reversed full speed, and a signal of three blasts blown; that there was no apparent effort on the part of the Biela to avoid the collision; and that the vessels came into contact at an angle of between three and four points between the port sides of the two steamers."

It is apparent from this quotation that the decision of the case depends upon the answer to the question, whether there was a fog at the time and place of collision so dense that the vessels could not see each other farther away than, say, 250 yards, or whether the night, although dark and overcast, was nevertheless clear enough to permit the lights of each vessel to be seen from the other at a distance of several miles. It would be amazing, if collision cases did not continually present the same state of affairs, to find that, without exception, every witness on board the Eagle Point—more than 30 in number—declares that the fog was dense, and that the steamship was continuously giving the proper fog signals; while, with equal unanimity, every witness from the Biela—only a few less than the other company—declares that the night was clear enough to permit the lights of the Eagle Point to be seen for several miles, and that no fog signals whatever were blown. It would be both wearisome and profitless to give even a brief summary of the voluminous testimony. It is sufficient to say that I have considered it with care, and have come to the conclusion that the foregoing account given by the Eagle Point is the more probable of the two. I adopt it as the finding of the court, and I also find as a fact that the Biela was steaming at full speed through the fog, without giving the signals required by the international rules. It follows, therefore, that the Biela must be held to have been in fault.

Upon this question of fog, I have not disregarded, but have taken into account, the testimony of two witnesses to which the libelant asks the court to give much weight. They were the captain and second officer of the Elise Marie, a German tank steamship which left New York in company with the Biela, and is alleged to have been near the place of collision about 1 o'clock. If it appeared

satisfactorily that the Elise Marie had been in the neighborhood at the time of the accident, it is, no doubt, true that the testimony of disinterested witnesses concerning this material point would receive much attention. But I think it is clear that the Biela, which was much the faster vessel, was more than 15 miles ahead of the Elise Marie at midnight,—out of sight, as the second officer testified,—and that it would be unsafe to assume that both vessels were encountering the same weather at the same moment of time. Besides, both these witnesses testify that about midnight they began to meet fog,—"showers of fog," as they describe it,—which continued until Monday at noon, and that these showers were dense enough to require fog signals to be given. This would seem to indicate plainly that the Biela must have found the fog an hour or two before, and throws serious discredit upon many of her witnesses who swore positively that there had been no fog at all up to the instant of the collision.

It remains to inquire whether the Eagle Point was also negligent, and upon this point nothing is still to be considered except the admitted speed at which she was going. Her full speed is about 12 knots, but several hours before the collision she had reduced this rate to 8 knots, or somewhat less. It is argued by the Biela that this was too high, assuming that the fog was dense, and considering the fact that the Eagle Point was approaching a frequented part of the Atlantic Ocean. Whether this speed was proper or not depends upon the surrounding circumstances, for it is manifest from the international regulation upon this subject that no hard and fast rule can be laid down. Article 16 is, in part, as follows:

"Every vessel shall in a fog, mist, falling snow or heavy rain storms, go at a moderate speed, having careful regard to the existing circumstances and conditions."

Under this article, "moderate speed" is clearly a relative term. Time, place, and all other circumstances and conditions, must be taken into account before judgment can be pronounced upon a given rate. In the present case the undisputed evidence proves that the Eagle Point was very light, carrying only about 300 tons of cargo, and that such a ship, carrying so small a load, could not be properly controlled at a lower rate of speed than the rate at which she was proceeding. Positive testimony to this effect was given on behalf of the Eagle Point, and no witness was offered in denial. This is, in effect, an admission that the testimony on this point is true; and I find, therefore, that the speed at which the Eagle Point was steaming was a moderate speed,—not greater than was proper under the surrounding circumstances. I see no ground upon which it can be held that she was guilty of negligence that contributed to the collision. The remaining questions raised by the claimant need not be discussed.

The libel will be dismissed, with costs.