### THE NORTHERN QUEEN.

(District Court, W. D. New York. September 18, 1902.)

1 COLLISION—SPEED IN FOG—MODERATE SPEED.

The moderate rate of speed in a fog required by rule 15 (28 Stat. 648) of the rules for navigation on the Great Lakes is such a rate as will enable a steamer to stop in time to avoid collision after coming within view of a vessel at anchor; and such rate must be rigidly observed, unless circumstances exist which make it dangerous to proceed at such moderate rate.

2. SAME—ANCHORAGE IN FAIRWAY.

The steamer Pathfinder, with the whaleback barge Sagamore, laden with ore, in tow, coming down Lake Superior, reached Whitefish Bay

---

¶ 1. See Collision, vol. 10, Cent. Dig. § 170.

at night, and was compelled by the dense fog to anchor a short distance above the entrance to St. Mary's river. The two vessels were lashed together and anchored in the usual sailing course of vessels, which is at that point from a quarter to a half mile in width; the navigable channel being about four miles wide. There were no established or customary anchorage grounds, and owing to the proximity of a number of other vessels, whose fog signals could be heard, some of which were drifting, the master, who was an experienced navigator, deemed it unsafe to attempt to move out of the fairway. About 10 o'clock the following morning, while the fog was still dense, the barge was struck and sunk by the steamer Northern Queen, bound up, which was going at full speed. *Held*, that the Queen was clearly in fault for maintaining such speed, especially in a place where vessels bound down would be expected to anchor during the fog; that the Pathfinder and barge could not be charged with contributory fault for anchoring in the fairway under the circumstances, considering the width of the channel, nor for neglect of proper precautions, it appearing that fog signals were regularly sounded, and an alarm signal blown on hearing the second signal from the Queen, and before she came in sight.

**8.** SAME—FOG SIGNALS—STEAMER AND TOW AT ANCHOR.
Where the fog bell on two vessels, 300 feet long, which were lashed together and anchored during a fog, were at opposite ends, so that the ringing of both might confuse approaching vessels, it was not negligence for the master, in the exercise of his best judgment, to direct that but one should be rung.

**4.** SAME—CONTRIBUTORY FAULT—BURDEN OF PROOF.
Where a moving steamer was clearly in fault for a collision with an anchored vessel, the burden rests upon her to prove contributory fault on the part of the latter, which is entitled to the benefit of every reasonable doubt.

**5.** SAME—ANCHORED VESSELS OBSTRUCTING CHANNEL—CONSTRUCTION OF STATUTE.
Act March 3, 1899 (30 Stat. 1152), providing that it shall not be lawful to anchor vessels "in navigable channels in such manner as to prevent or obstruct the passage of other vessels," does not apply to vessels anchored in a bay where there is navigable water four miles in width, although they are in the usual course of passing vessels.

**6.** SAME—PROCEEDINGS FOR LIMITATION OF LIABILITY—CLAIMS FOR WRONGFUL DEATH.
Where by statute in force at a place of collision a right of action for wrongful death survives to the widow or next of kin of the decedent, a claim for damages for the death of a person who lost his life in such collision may be enforced in a court of admiralty in proceedings by the owner of the offending vessel for a limitation of liability.

In Admiralty. Suit against the steamship Northern Queen to recover damages for collision, and petition by the owners for a limitation of liability.

Hoyt, Dustin & Kelley and Harvey L. Brown, for libelant, Elizabeth B. Ives, administratrix, and Wildridge G. Terry, administrator.

Shaw, Waite, Cady & Oakes (Brundage & Dudley, of counsel), for respondent.

HAZEL, District Judge. The libel in this cause of collision was filed on September 23, 1901, by the Huron Barge Company, owner of the Sagamore, against the steamship Northern Queen, owned by the Northern Steamship Company, a corporation organized under the

¶ 6. Limitation of shipowner's liability, see note to The Longfellow, 45 C. C. A. 387.

laws of the state of Wisconsin. On October 4, 1901, a petition was filed by the Northern Steamship Company for limitation of liability for collision between said steamship Northern Queen and the whaleback barge Sagamore, at the same time denying liability, and averring that other libels might be filed by other interests against the Northern Queen, and praying that her liability upon all claims filed might be determined under the limited liability act. A cross-libel has been filed on the part of the Northern Steamship Company against the libelant and the steamer Pathfinder. A stipulation was entered into by proctors for libelant, for Elizabeth B. Ives, administratrix of the estate of Ira Ives, deceased, and Wildridge G. Terry, administrator of the estate of Ernest C. Joinder, deceased, who have filed claims in the limited liability proceeding, and proctors for the Northern Steamship Company, that the suit instituted by the Huron Barge Company, which was the owner of the whaleback barge Sagamore, be consolidated with the proceeding instituted to limit liability, and that the issues raised by the pleadings and claims for damages be heard together by the court; the monition having directed that all claims for damages by reason of the collision that occurred between the Sagamore and Northern Queen in a dense fog at about 10 o'clock in the morning of July 29, 1901, be presented to the court in the first instance. The whaleback barge Sagamore, about 300 feet in length over all, laden with iron ore, drawing 17½ feet, was almost instantly sunk, stern first, in 12 fathoms of water. There was not sufficient time to her crew to escape with safety. They were precipitated in the water, and two were drowned,—her master and steward. Claims for damages have been filed by their legal representatives.

The collision took place at the head of St. Mary's river, off Point Iroquois, about a half mile northwest of Gros Cap gas buoy, directly in the course of sailing vessels, but at a point where the river is four miles wide, and opening into Whitefish Bay, which extends northerly into Lake Superior. The sailing course is well known to navigators as about one-quarter to one-half mile in width, with a mile and a half navigable water on each side. Under ordinary circumstances, therefore, it is neither dangerous nor in any degree hazardous to attempt an anchorage at the side of the fairway. There are no established anchorage grounds in Whitefish Bay or in the neighborhood of St. Mary's river. The expert testimony offered by respondent does not satisfy the court that an anchorage ground is established by prevailing custom of navigators on the lakes. No established usage is shown, although it quite satisfactorily appears that a majority of the expert witnesses are strongly of the opinion that it would have been far safer for the Pathfinder and Sagamore to have anchored off the course. A number of the experts testify that they would have done so, other experts for libelant deemed the action of Capt. Mallory wise and prudent. Ascending vessels do not ordinarily anchor in foggy weather outside and to the northward of Gros Cap gas buoy. At this point the bay widens into what may be regarded as an arm of the lake, and risks of collision are relatively minimized. South of the Gros Cap gas buoy, in St. Mary's river, where, for

safety, vessels are required to remain in the channel, navigation in a dense fog is involved with considerable danger.

The whaleback steamer Pathfinder, with the whaleback barge Sagamore in tow, both heavily laden with iron ore, left the port of Duluth, Minn., bound for Lake Erie, at midnight on July 26, 1901; weather clear. Soon after, it became very foggy. The fog was dense until after the collision. The distance from Duluth to St. Mary's river is about 365 miles, and the trip down was in straight sailing courses. They passed Whitefish Point on July 28th at about half past 4 o'clock in the afternoon. The point could not be seen, because of the density of the fog. The fog whistle on Whitefish Point, however, easily recognized and distinctly heard far off and near, enabled the master of the Pathfinder to distinguish the locality, his proximity to the point, and to the usual pathway of vessels from the point southerly through Whitefish Bay. It was difficult for him to determine merely by the sound of the fog whistle on the point his exact distance and bearing therefrom. Nevertheless, after hearing it he shaped the course of his vessel in the direction of Point Iroquois, about 25 miles distant, reaching there in the early evening. He passed very close to a steamboat between Parisian Island and Point Iroquois. The fog continuing dense, he drew his consort to his starboard side, and lashed her to the Pathfinder forward, aft and amidships. Thus made fast, the Pathfinder dropped her anchor about one-half mile northwest of the Gros Cap gas buoy, which brought her diagonally across the fairway. The Sagamore did not drop her anchor. Just before anchoring, a number of other bells and whistles of vessels lying at anchor or drifting were heard. Fog signals were sounded ahead and to starboard. Capt. Mallory, of the Pathfinder, testifies that, in his judgment, it was unsafe to proceed farther, and therefore he let go his anchor. It was in the ordinary course of vessels up and down bound. No attempt was made to anchor either to the eastward or westward. The wind—a light breeze—was on her starboard. Because of the density of the fog, other vessels at anchor, or their lights, were not visible. During the night and early morning, between the hours of 2 and 7, the steamers Harlem, Senator, and Miami, upbound, passed very near. The masters of these vessels testify that passing was affected within a distance of 75, 150, and 500 feet, respectively; that aport or hard aport movement by each vessel was necessary to clear the vessels at anchor. They heard no bell on the Sagamore, whose lights suddenly and unexpectedly loomed up out of the fog. This is disputed by Howard, mate of the Pathfinder on watch, who testifies that no vessel passed early that morning nearer than 1,000 feet, and that the Sagamore's bell was regularly sounded.

The undoubted weight of the evidence establishes that the Sagamore, while at anchor prior to the collision, seasonably complied with rule 14, subd. "e," 28 Stat. 648, which requires any vessel at anchor near a channel or fairway to, at intervals of not more than two minutes, ring her bell rapidly for three to five seconds. Her bell,—the prescribed signal,—when sounded, was clear and distinct. The Pathfinder did not ring her bell or give any signal. Her master testi-

fies that, as the bells of the Sagamore and Pathfinder were at different ends of the two vessels, he considered that, if he sounded a bell on each vessel, passing steamers might regard that the sounds were from vessels lying apart, and might therefore attempt to steer their course between them. Hence one bell was used to signal for both vessels. His reasoning would seem to be correct. It is contended by respondent that the Sagamore's bell was improperly placed, was insufficient, and the clearness of its sound impaired. The Sagamore was of ordinary whaleback build. Heavily laden, her widest part was three or four feet underneath the surface of the water. Her bell was fastened to a frame or crosspiece of timber, attached to the upper part of the after turret. The testimony of Hendricks, master of the Harlem, Irvine, of the Senator, and Huyser, of the Miami, that when they passed the Sagamore at different times between 2 and 7 o'clock she was not ringing her bell, and any presumptions that may arise therefrom, cannot be permitted to outweigh the corroborative testimony of the masters of the Colby, Barge 110, Uranus, Madden, and Stephenson. These vessels were anchored or drifting in the immediate vicinity of the collision,—the Uranus, under way, blowing an alarm signal, one-quarter of a mile southerly and to the windward, which was in the direction of the Northern Queen as she approached; the Colby and Barge 110, at anchor, three-quarters mile to windward; the steamer Madden and barges under way, about one-quarter mile astern; the Stephenson, blowing a whistle and ringing her bell, one-quarter mile to the southeast. These vessels frequently and at regular intervals heard the fog signals of the Sagamore during the morning just prior to the collision. Their fog bells and whistles were distinctly heard on the Pathfinder and Sagamore. The Northern Queen did not hear them, nor any bells, just before the collision. It was a light, southeast wind. The testimony of the master of the Pathfinder and of Seamen Smith and Graham shows that they heard the bells and whistles of the other vessels anchored near them quite distinctly. Suddenly three blasts of the whistle of an approaching steamer were heard. They were the fog signals of the Northern Queen. Smith was ringing the bell on the Sagamore, increasing the frequency of the sound whenever he heard a whistle. He heard signals sounded two or three times at regular intervals on the Northern Queen, each signal indicating her approach. The last brought her very close, evidently coming head on. The master of the Pathfinder quickly ran to the top of his pilot house and pulled an alarm signal. Simultaneously the Northern Queen loomed up through the fog from a southeasterly direction on the Sagamore's starboard side, about three or four hundred feet distant. The bell of the Sagamore was then constantly ringing. The signal to reverse was quickly sounded by the Northern Queen to her engineer. She did not comply. It is claimed that her engineer misunderstood the order. Mr. Hunt, the engineer, witness for libelant, testifies that he was running under check up to 9:30 o'clock, when he received an O. K. bell, which indicated to proceed at full speed. She averaged 72⅓ revolutions of her wheel, which resulted in a rate of speed through the water of 12 miles and a half an hour. Her speed was not altered. Just before the collision he received a

signal to reverse. Instantly he received another to work the engine strong. The engine was therefore not reversed before the collision. The master of the Northern Queen admits that she came swiftly on her course at the rate of about 7 miles per hour over the water, but by the testimony of the engineer it appears quite clearly that she was proceeding at full speed. The engineer is corroborated by witness Radenmacher, employed at the time as oiler on the Northern Queen. Her wheelsman testifies that her speed was about 7 or 8 miles an hour. He says she ran from the point where she made a change of course at the Round Island Ranges, just before reaching the Middle Ground, to the place of collision, in 35 minutes; the distance being about 7½ miles. The time consumed in going that distance would indicate that he was in error, and that the vessel was moving at her full speed. Her master, who was on the pilot house, testifies that she was going about eight miles an hour. It was practically undisputed that she was proceeding in a dense fog at an immoderately excessive rate of speed, and in violation of rule 15, by which it is provided that every vessel shall, in a fog, mist, or thick weather, go at a moderate speed. She struck the Sagamore a glancing blow with terrific force on the starboard side, just forward of her after turret. The Sagamore sunk immediately, and became a total loss. The Northern Queen after the collision proceeded on her course. She hove a line to a seaman, pulling him on board, then swung around, her momentum carrying her across the towline of the Madden, and disappeared in the fog. Subsequently she returned to the "Soo" for necessary repairs. It may be that the density of the fog and her proximity to the Madden demanded her undivided attention. Some water came in through her bow. The lines parted by which the Pathfinder and Sagamore were lashed together. Perault, the wheelsman of the Northern Queen, testifies that he heard a bell just dead ahead before he sighted the Sagamore. She was then 500 or 600 feet away. The Pathfinder was blowing an alarm. He received and obeyed an order to hard astarboard. The Northern Queen, when swinging to port, crashed into the Sagamore. The master of the Northern Queen heard no bells until the Sagamore came in view. He heard the alarm from the Pathfinder, but thought at first that the barge was under way.

It was held in The Chattahoochee, 173 U. S. 548, 19 Sup. Ct. 491, 43 L. Ed. 801, that "moderate speed" consists in such a rate as will enable a steamer to stop in time to avoid collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. The Sagamore being at anchor, the principle enunciated in this case would require the Northern Queen to proceed at such a moderate rate of speed as would have prevented the collision by proper management, after the Sagamore came in view, unless circumstances existed which made it dangerous for her to proceed at moderate speed. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Batavier, 40 Eng. Law & Eq. 19; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687. This rule is well settled, and, where properly applied, has been reaffirmed and followed. Undoubtedly the rule ought not to be rigidly enforced where the circumstances tend to

show, as in The Eagle Point (D. C.) 114 Fed. 971, that it was hazardous and unsafe to strictly comply with its provisions. Is it proper to invoke these principles in this case? The immoderately excessive speed of the Northern Queen, so clearly established, must be condemned. Navigation in the locality of the collision in a dense fog admittedly requires caution and prudence. The master of the Northern Queen must be presumed to have known that vessels bound down, nearing the mouth of St. Mary's river in a dense fog, would be forced to anchor. Furthermore, the circumstances justify a fair presumption that the fog bell sounded by the Sagamore would have been heard upon the Northern Queen, had her deck watch been vigilant and discriminating, unless their hearing was impaired by the speed of the vessel and the resultant noises, which undoubtedly interfered with the power of the deck watch to hear as clearly as they should. On the other hand, if it be true that the ordinary sound of the bell could not be heard, owing to atmospheric conditions, it was still more the duty of the Northern Queen to have exercised greater caution to avoid unseen danger. I conclude that the Northern Queen failed in her duty to exercise such caution as the circumstances and conditions of the weather required. At the time of the collision she was in actual violation of the statutory rule enacted to prevent collisions, by virtue of her excessive speed. The Nacoochee, supra; The Batavier, supra. The burden therefore falls upon her to show that the collision was not owing to her neglect. Having failed to use the proper measure of precaution prescribed by the statute, she must be held in fault. I am well convinced that, had she proceeded more moderately, her movement could have been controlled in time to avoid the disaster.

The respondent, by its cross-libel and its petition in the limited liability proceeding, also charges negligence against the Pathfinder and the Sagamore. Such charges of fault are (1) negligently anchoring in the fairway or by the ranges, when there was ample safe anchorage on either side; (2) insufficient and incompetent watch; (3) failure to give statutory fog signals. Some of these charges have already been noticed. It is contended that before anchoring the Pathfinder, knowing that at least she was approximately in the fairway, should have made for anchorage to east or westward of her course. This could have been safely accomplished by taking soundings. She would not then have been a menace to moving steamers. This alleged negligent omission is claimed by counsel for the respondent as the proximate cause for the collision. Capt. Mallory's judgment, inducing him to anchor at the point in question, has already been alluded to. He was a navigator of 17 years' experience. The proximity of other vessels, significantly indicated by their signals, was a controlling circumstance inducing him to anchor immediately, though in his course. Howard, mate of the Pathfinder, also deemed it unsafe to go farther. The question, therefore, presented, is whether the Pathfinder and Sagamore shall be held in fault for anchoring in the fairway in a dense fog in Whitefish Bay at the head of St. Mary's river. Under the existing circumstances, by so doing did they ignore a rule of precaution which is ordinarily required in the course of navigation? I have already said that the proofs do not establish a cus-

tom requiring anchoring out of a sailing course. No regulation pro-hibited it. There was no special insecurity for lying at anchor at this place, fog signals being sounded, where the fairway was one-half mile wide, with an abundance of navigable water on each side; the navigable channel being four miles in width at the point of collision. It has often been held that, if there is no rule or custom requiring a vessel to bring up out of the fairway, she might anchor there, although directly in the track of ships. Mars. Mar. Coll. 234; Spencer, Mar. Coll. § 111; The Ogemaw (D. C.) 32 Fed. 924. In The City of Dundee, 47 C. C. A. 581, 108 Fed. 679, the court held the ferry-boat which came in collision with the Dundee solely at fault, not-withstanding the fact that the Dundee had anchored outside of the anchorage grounds prescribed by the authorities of the city of Phil-adelphia. Her pilot (an experienced one) had used his best judg-ment to find an anchorage. The one found in the middle of the stream was the safest one available, and the court held that, notwith-standing the regulations establishing anchorage grounds in the vicin-ity, circumstances might exist justifying a vessel anchoring beyond or outside the anchorage limits, without the imputation of negligence. Assuming that the master of the Pathfinder and tow knew he was in the sailing course, he was justified in considering the surrounding circumstances in choosing his anchorage. His judgment as to what was best to be done was controlled by his knowledge of the rules and law governing the movements of vessels in a fog. He rightfully as-sumed that moving vessels would comply with the statutory require-ments. The law required him, when at anchor, to sound his bell at prescribed intervals, giving notice of his position. He complied with the duty imposed upon him. The Northern Queen was not lightly laden, and therefore under control. She was well equipped, and laden with 1,200 tons of freight. No reason is apparent why she did not proceed at a moderate rate of speed. If rules enacted for the safety of vessels navigating the Great Lakes, and rivers connecting them, may be varied or altered to suit the masters of ships, their very pur-pose is defeated. The language used in The Clara Davidson v. The Virginia (D. C.) 24 Fed. 763, may in this connection be fittingly quoted:

"Those rules are the law of laws in cases of collision. They admit of no option or choice. No navigator is at liberty to set up his discretion against them. If these rules were subject to the caprice or election of masters and pilots, they would be not only useless, but worse than useless. These rules are imperative. They yield to necessity, indeed, but only to actual and ob-vious necessity."

I am clearly of the opinion that there is no fault attributable to the Pathfinder for anchoring in the sailing course at this point. In com-ing to this conclusion I have given weight to the width of the channel, the surrounding atmospheric conditions, and the number of vessels in the immediate neighborhood. Nor do I think that the circumstances called for a more vigilant anchor watch than was maintained upon the sunken Sagamore. The conditions rendered such a watch unneces-sary. She gave the statutory signals. When those finally failed, she sounded an alarm. What more could be required? The cases to

which my attention is called by respondent's counsel—The Raynor, Fed. Cas. No. 9,267; and The Ogemaw (D. C.) 32 Fed. 919—do not seem to have application to the case at bar. In those cases the court held that it was essential to take all the precautions to avoid collisions which the exigencies of the situation might require. This language can only be held applicable in cases where it was established that the adoption of those specified precautions would have been of service in avoiding the disaster. The Northern Queen was clearly at fault. This fact is obvious and inexcusable. The evidence tending to condemn the Sagamore is not sufficiently clear and convincing to establish her fault, or divide the damages between the colliding vessels. The Victory and The Plymothian, 168 U. S. 429, 18 Sup. Ct. 149, 42 L. Ed. 519. Just prior to the collision, Capt. Mallory acted as watch on the Pathfinder. Instantly on hearing the second signal of the Northern Queen, just before she came out of the fog, he blew the alarm. There seems to have been no necessity for blowing it sooner. The preponderance of the evidence shows the anchored vessels complied with their full duty in sounding fog signals at intervals, and giving such warning as appeared necessary. The alarm was sounded as soon as danger was apparent. In this view, special-danger rules 27 and 28 were not violated. I am favorably impressed by Capt. Mallory's reason for not sounding bells on both vessels. For greater safety, it seemed to him better that but one of the vessels should do so. There is undoubted force in his suggestion. Confusion might arise from ringing two bells placed at different ends of two vessels lashed together. However that may be, the failure to ring both bells did not contribute to the disaster. On the whole case, I am of opinion that the Northern Queen failed to meet the burden which, through her plain fault, the law has placed upon her,—of showing fault on the part of the Sagamore or Pathfinder. Every presumption is adverse to the contention, and a reasonable doubt with regard to the propriety of the conduct of the Sagamore and Pathfinder must be resolved in their favor. The City of New York, 147 U. S. 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Oregon, 158 U. S. 187, 15 Sup. Ct. 804, 39 L. Ed. 943.

Since the argument the attention of the court has been called to U. S. v. St. Louis & M. V. Transp. Co., 184 U. S. 247, 22 Sup. Ct. 350, 46 L. Ed. 520. Counsel for the Northern Queen claims the decision in that case supports the theory that the anchorage of the Sagamore and Pathfinder was improper, and therefore they must be condemned. In the case cited the collision was in the Mississippi river, at the port of New Orleans. The anchorage ground chosen—to adopt the language of the court—"rendered the navigation of the river by towboats with tows pursuing their usual and customary course hazardous and extremely dangerous." It cannot be held that the Sagamore's position accomplished any such result. The anchored vessels were also placed, in the St. Louis Case, without the orders of the harbor master of New Orleans, who had supervision of the river at the point in question. The navigation in the case at bar was rendered hazardous, not by the position of an anchored vessel, but by the heavy fog. This con-

dition was under the sole control of a power infinitely higher than the officers of the Sagamore.

Proctors for respondent claim that the act of congress of March 3, 1899, § 15 (30 Stat. 1152), applies in the present case. The section in question is as follows:

"That it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."

This can have no application to the case at bar. Here the anchoring, though in the usual pathway of steamers, was not such an obstruction of the navigable channel as was contemplated by the act referred to. Congress has the undoubted power "to regulate commerce," which comprehends the control, to the extent necessary, of all navigable rivers. 21 Am. & Eng. Enc. Law, 432. A liberal interpretation of the act implies that navigation shall not be hindered or interfered with by obstruction, either by anchoring or otherwise, in such a manner as to prevent its safe accomplishment. Hughes, Adm. 263. A "channel" is defined by the Century Dictionary to be "the deeper part of a river, or of an estuary, bay, etc., where the current flows, or which is most convenient for the track of ships." Assuming, then, that the sailing course was a channel, the waters at the point of collision were very deep and wide. They certainly afforded abundant room for safe passing. The anchorage of the Pathfinder and Sagamore did not impede or prevent the passage of other vessels using such caution as the circumstances required. No difficulty at all would have been experienced, had the fog not obscured the Northern Queen's path; nor, indeed, would the disaster have happened if she had not proceeded at an immoderate rate of speed. For the foregoing reasons, I do not think that the charges against the Pathfinder and Sagamore can be sustained.

The disaster occurred in waters dividing the state of Michigan and the province of Ontario, Canada. It was close to the division line. It is not disclosed whether Joiner, master, and Ives, steward, of the Sagamore, were drowned in American or foreign waters. The statutes of the state of Michigan and the province of Ontario were read in evidence by stipulation of proctors. By these statutes it appears that a right of action survives to the widow or next of kin of the decedent. Therefore the claims filed to recover damages for their deaths are maintainable in admiralty (The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358), and in this proceeding for limitation of liability.

I find that the collision occurred solely by reason of the fault of those in charge of the navigation of the Northern Queen. The owners of the Queen are entitled to a limitation of liability. The libelant, Huron Barge Company, and the other claimants are entitled to recover damages as they may be fixed in that proceeding. There must necessarily be a reference to a commissioner to compute them. Such a decree may be entered accordingly.