## THE JOB H. JACKSON. THE ANN J. TRAINER. THE BAYPORT.

(District Court, E. D. Virginia. April 2, 1906.)

1. COLLISION—STEAM AND SAILING VESSELS MEETING.

A steamer *held* solely in fault for a collision with a meeting schooner in the night near the mouth of Hampton Roads, where she saw the other vessel when two miles distant; it being her duty, as the burdened vessel and having ample sea room and fair weather, to so navigate as to avoid even danger of collision, and it not being established that the schooner changed either her course or speed until immediately before the collision.

**2. SAME—SCHOONER AND ANCHORED STEAMER—ANCHORAGE IN CHANNEL.**

A vessel anchored at night in calm weather as the result of a previous collision in Hampton Roads in the middle of the channel, which was there a mile or more wide for seagoing vessels, was not chargeable with violation of section 15 of Act March 3, 1899, c. 425, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], prohibiting vessels from anchoring in navigable channels in such manner as to prevent or obstruct the passage of other vessels; and, where she carried proper lights, and kept an anchor watch who gave due warning by signals to an approaching schooner, the latter was solely in fault for a collision between them.

In Admiralty. Suit for collision.

Hughes & Little, for The Jackson.
Carver & Blodgett and Whitehurst & Hughes, for The Bayport.
Edward R. Baird, Jr., for The Ann J. Trainer.

WADDILL, District Judge. On the evening of the 25th of September, 1905, about 7:30 o'clock, the Bayport, an ocean-going whaleback steamer loaded with coal, while proceeding from the port of Newport News to the Virginia capes, at a point opposite Thimble Light, and a little to the northeast of midchannel, collided with the three-masted schooner Job H. Jackson, coming into Hampton Roads light, on a course west by half north en route to the port of Norfolk; the wind at the time being fresh, N. N. E., the night clear, and the sea smooth. As a result of the collision, the Jackson shortly thereafter sank, and the Bayport, while aiding in the rescue of the Jackson's crew, one of whom, the helmsman, was drowned, came to anchor. On the morning of September 26, 1905, about 3:30 o'clock, the three-masted schooner Ann J. Trainer, also bound into Hampton Roads, came into collision with the Bayport while thus at anchor.

These proceedings were taken in the following order: Williamson, master of the Job H. Jackson, filed his libel against the Bayport, and the latter subsequently filed her cross-libel against the Jackson; and thereupon, under admiralty rule No. 4 of this court, Dericksen, master of the Ann J. Trainer, filed his petition and libel in the first-named suit; and subsequently the Bayport filed her cross-libel against the Trainer.

The court will proceed to dispose of the cases in the order of their filing.

### (1) The Collision with the Jackson.

The faults assigned by the Jackson are, briefly: That while coming into Hampton Roads, having the right of way over the Bayport, she saw and observed, a little on her starboard bow, the green and range lights of the latter, at a distance of half a mile, approaching her, and proceeded steadily on her course, without changing the same, or altering her speed, until the vessels were within a very short distance of each other, when the Bayport suddenly shut in her green, and showed her red light about a point on the Jackson's starboard bow, and, after thus seeing a collision was inevitable, the schooner put her helm hard-aport, with a view of lightening the blow of the collision, and the Bayport, continuing on her course, struck her on the port bow near the fore-rigging, cutting into the schooner, causing her quickly to sink; the

specific faults assigned against the Bayport being failure to keep an efficient lookout, an inefficient navigator, failure to keep her course and failure to give proper signals as to her movements, the effort to cross ahead of the schooner, improper change in course, failure to allow sufficient margin for safe navigation, and keep out of the way of the schooner. The Bayport, on the other hand, says that, in coming down the roads, she observed the schooner Jackson at a distance of two miles off, showing her green light on her starboard bow, and she continued on her course, believing that there was sufficient margin on the then courses of the two vessels for safe navigation; that suddenly, when about half a mile off, the Jackson shut in her green light and showed her red, when the Bayport immediately put her helm hardaport, sounded her danger signals, and stopped her engines, and reversed; that the schooner, instead of continuing on her course, again changed her course, shut in her red light, and showed only her green to the steamship; that, during this operation, the steamer's engines continued backing full speed, and, shortly before the collision, the schooner again changed her course, shutting in her green and opening her red light.

Upon this issue, a large amount of evidence was taken, and in many respects the conflict between the witnesses is irreconcilable as to the navigation of the two vessels at and about the time of the collision, but which need not be discussed in detail further than to say that the same has been fully considered, and, in the view taken by the court, it is quite clear not only from the evidence of the libelant, but as well that of the Bayport, that the collision resulted solely from the fault of those navigating the steamship. At the point of collision, the channel was at least a mile wide for vessels of this kind, the sea was open and unobstructed, and there was nothing in existing conditions respecting either the weather, wind, or sea to make a collision at all probable, to mariners exercising proper vigilance for safe and careful navigation of their ships. Under the rules of navigation, the Jackson was the favored vessel, and it was the duty of the Bayport to keep out of her way; the corresponding obligation being imposed upon the Jackson that she should maintain her course and speed. While it is true that the collision may have occurred as contended by the Bayport, namely, that the Jackson, after several times showing uncertainty as to her movements, suddenly cut across her bow, and ran into the steamer, still this account is highly improbable (Haney v. Steam Packet Co., 23 How. 287, 16 L. Ed. 562), and is not supported by the evidence; and, moreover, the court would be slow, upon the Bayport's own showing, to condemn the Jackson. According to her navigators, the green lights of the Jackson were seen two miles away slightly on the former's starboard bow, and, while the Bayport had the right to navigate upon the theory that there would be no change in the Jackson's course, she should not have proceeded in such close proximity thereto as to endanger or run risk of collision, by reason of a sudden and unanticipated movement on the part of the approaching vessel, particularly where, as in this case, there was ample room for the vessels to pass each other in safety. The obligation to avoid risk of collision was imposed upon the Bayport from the time of sighting the Jackson two

miles away, and, after she first changed her course according to the Bayport's contention, when about half a mile away, by shutting in her green and showing her red light, manifestly the Bayport should have made the proper maneuver to avoid the collision. It is true the rules of navigation (articles 20 and 23; Act Aug. 19, 1890, c. 802, 26 Stat. 327 [U. S. Comp. St. 1901, p. 2870]) contemplate that, when a steam and sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall, if necessary, slacken her speed, or stop or reverse. Still this does not mean that the burdened vessel must make this maneuver, if by so doing it would increase, instead of lessening, the chances of collision. When the Bayport observed the Jackson suddenly showing her red light half a mile away, taking it immediately across the steamer's course, she should have ported, and, if necessary, hardaported her wheel, and proceeded to starboard; and the sudden sounding of the alarm signals and backing and reversing, while it tended to change the bow of the steamer, also tended to keep her in her then position, or throw her further across the course of the Jackson. The Richmond (D. C.) 114 Fed. 208, 213, and cases there cited. Certain it is there were no such conditions existing at the time, and immediately preceding the same, as would excuse the Bayport for not avoiding the collision with the Jackson, seeing and observing her movements at the distance she admittedly did. To avoid the risk of collision, as well as the collision, was the obligation imposed upon her as the burdened vessel. The New York, 175 U. S. 187, 207, 20 Sup. Ct. 67, 44 L. Ed. 126; The Delmar (D. C.) 125 Fed. 130. The latter was a case of collision between a sailing vessel bound inward, and an outgoing tug with a tow, and which occurred virtually at the point of the collision now under consideration.

## (2) The Collision with the Trainer.

Coming to the second collision, the Ann J. Trainer insists that the Bayport was improperly anchored, in that she was so located as unduly to obstruct and impede nagivation at the point of collision, under the provisions of section 15 of Act March 3, 1899. c. 425, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543], and that her lights were not properly set and burning (article 11, Inland Rules); that she was without proper lookout or anchorage watch; and that she failed to give any proper signal or warning as to her location. Whereas, the Bayport contends that her place of anchorage was where she had the right to be, and that she was there as a result of the collision hereinbefore referred to with the Jackson, that she in no manner unduly obstructed or impeded navigation, and that, while she did not have her ordinary anchor lights, those set were the best that could be provided in the condition of the steamer after the first collision, namely, a light upon the after mast, suspended some five or six feet above the top of the pilot house, and 25 feet above the main deck, as an anchor light, which showed all around the horizon, also a light on either side of the top of the turret on the forward deck, and a light fastened to the broken mast 20 feet above the deck, some nine feet above the turret, which also showed all around the horizon; the lamp upon the after mast being the ordinary range light, and that upon the forward broken

·mast, the ordinary anchor light. Also had other lights showing from ·the cabin windows, and a fan-tail light suspended so as to light the companion way of the vessel; and, in addition, placed a proper anchor watch with directions to sound danger signals upon the approach of passing vessels. . That the lights thus set were a substantial compliance with the rules of navigation, and in all respects sufficient to give notice of her position at anchor. And that the collision was brought about solely from the negligence and want of care on the part of those navigating the Trainer.

The act of Congress of March 3, 1899, supra, provides "that it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft." Assuming that this section applies to channels of the character under consideration here, in the open bay, where · the ship channel for ocean-going vessels was some mile or more wide, and for vessels of the draft of the Trainer, much wider (Northern Queen [D. C.] 117 Fed. 906-908, 914, 915), it may be said in passing that the trend of interpretation of the act has been to give it a liberal meaning, and that its purpose was not to prevent vessels from coming to anchor in navigable channels, but to forbid them from doing so in such manner as to obstruct said channels, or render their navigation difficult or dangerous. Hughes, Adm. 264; Northern Queen (D. C.) 117 Fed. 906, 913, supra; The Itasca (D. C.) 117 Fed. 885; The John H. Starin, 122 Fed. 236, 237, 58 C. C. A. 600; The Caldy (D. C.) 123 Fed. 802, 805; The City of Birmingham (C. C. A.) 138 Fed. 555, 559. Be this as it may, however, and without intending specially to pass upon the meaning of this act, the Bayport should not be held to have been improperly anchored, or to have obstructed the channel on this occasion. She was about midway of the channel, with half a · mile of water to each side of her for the deepest sea-going vessels, and there was nothing in the conditions of .weather, or otherwise, that made it unsafe or impractical for passing vessels to take either side in safety, in the exercise of ordinary care and prudence; and, moreover, her position was not one of choice on her part, but of necessity, she having been compelled to anchor there over night, because of the previous collision above referred to, which should, under the facts of this case, serve to relieve her from liability for the collision, so far as the question of anchorage is concerned. United States v. St. Louis, 184 U. S. 247, 255, 22 Sup. Ct. 350, 46 L. Ed. 520; Spencer on Mar. Collisions, § 111; The Indiana, 1 Abb. Adm. 430, Fed. Cas. No. 7,020; The Scioto, 2 Ware (Dav. 359) 360, Fed. Cas. No. 12,508.

Having reached the conclusion that the Bayport was without fault, under the circumstances of this case, so far as her place of anchorage is concerned, the question of the cause of the collision otherwise is to be considered. The evidence in this respect is not entirely free from conflict, but, in the judgment of the court, it largely preponderates in support of the Bayport's contention that she, after her anchorage, and at the time of the collision, had properly set and burning such lights as were sufficient to inform all persons properly navigating those waters of her location, and that she was at anchor; that she also had a proper anchor watch, and at the time of the collision, and for some

minutes before, otherwise gave sufficient warning to the Trainer of her proximity, by sounding danger signals. One of the best evidences of the sufficiency of the lights displayed on the occasion in question, by the Bayport, was that the Trainer's lookout saw them a mile off, and so reported them; and, with this knowledge on the part of the Trainer, it was inexcusable for her to have collided with a vessel at rest. The anchored vessel, on this occasion, was the favored one, and all the presumptions as between it and the moving vessel are against the latter, and, while ordinarily a sailing vessel has the right of way over a moving steam vessel, it is not true as to one at anchor; and hence a sailing vessel is charged with the duty and obligation, upon seeing a white light ahead, to so navigate as not to involve risk of collision. It is indicative of danger ahead, and the presence of possible danger should keep other navigators on the alert.

It follows from what has been said that, for the collision with the Jackson, the Bayport was solely at fault, and should be held liable therefor; and, for that with the Trainer, the latter was solely at fault and should be held liable.

And decrees may be so entered.