## THE DIRECTOR.

(District Court, S. D. Alabama, S. D. July 29, 1910.)

No. 1,249.

1. COLLISION (§ 9*)—HARBOR RULES—NONENFORCEMENT.

Where a navigation rule adopted for Mobile Harbor provided that on the arrival of vessels in the Mobile river they should rig their outriggers, etc., but it had not been enforced for many years, such nonenforcement might be considered as permission to vessels to keep their outriggers out.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 8; Dec. Dig. § 9.*]

2. COLLISION (§ 9*)—OUTRIGGERS—HARBOR RULES.

Nonenforcement of a harbor rule for a considerable period, requiring vessels at anchor to take in outriggers, did not relieve a vessel from responsibility for damage to other vessels by reason of outriggers not taken in.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 8; Dec. Dig. § 9.*]

3. COLLISION (§ 69*)—SCHOONER AT ANCHOR—PRECAUTIONS.

Where a schooner at anchor in Mobile river was in the proper place, but by reason of stress of weather swung into the channel, resulting in collision with a steamer, and it appeared that the weather had been unsettled during the day and storm warnings displayed, the vessel was at fault in failing to let out a stern anchor, or to provide a proper anchor watch, under the rule that a vessel at anchor in a dangerous position should take such precautions as are commensurate with the perils assumed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 89; Dec. Dig. § 69.*]

4. COLLISION (§ 71*)—VESSEL AT ANCHOR—DUTY TO VESSEL UNDER WAY.

In general a vessel under way is prima facie at fault for collision with a vessel at anchor, though the latter is brought up in an improper place, provided the vessel under way could with ordinary care have avoided her.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5.** COLLISION (§ 43\*)—DUTY OF STEAMSHIP.

A steamship about to collide with a schooner easily seen is bound to use due precaution and care and to come to a standstill by reversing her engines if necessary before she should collide.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 43–47; Dec. Dig. § 43.\*]

**6.** COLLISION (§ 72\*)—STEAMER IN COLLISION WITH SCHOONER AT ANCHOR—FAULT.

Where a schooner at anchor in the channel of a river by reason of stress of weather had swung astern into the channel, and notwithstanding notice of the weather conditions had not been protected by a stern anchor or anchor watch, and collision with a steamer resulted from this and from the steamer's failure to come to a standstill when collision was imminent, or to have deflected sufficiently to avoid collision as could easily have been done, both were at fault, requiring a division of damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 102; Dec. Dig. § 72.\*]

In Admiralty. Action by Adrian E. Hooper, as master of the schooner Henry Lippitt, against Steamship Director to recover damages for collision. Damages divided.

Gregory L. & H. T. Smith (W. G. Caffey, of counsel), for libelant. Pillans, Hanaw & Pillans (H. Pillans, of counsel), for claimant.

TOULMIN, District Judge. This is a suit for damages for a collision. I find, as is not unusual in such cases, a want of consistency and harmony in much of the evidence, and some positive conflict as to material facts. But from a careful examination and analysis of it I think the weight of the evidence establishes these facts:

On the night of February 25, 1910, the schooner Henry Lippitt, in charge and under the direction of a regular licensed pilot of the bar and river of Mobile, was brought into said river and anchored on the east side of the channel opposite to, and east of, Dauphin street in the city of Mobile, and about 450 feet from said wharf. She was anchored in a customary place for anchoring schooners of her description. On February 27, 1910, she was lying up and down the river at her place of anchorage with her bow to the north or a little northeastward and her stern to the south or southwestward, with an anchor out at her bow on 15 fathoms of chain. Between 2 and 3 o'clock p. m. on that day, the steamer Director, in charge of the deputy harbor master of the port of Mobile as pilot, was proceeding up the west side of the middle of the channel of said river at slow speed—two to four miles an hour. By force of the wind then prevailing the schooner was driven around westwardly into and partly across the channel, and came astern, resulting in collision with said steamer, which was at the time crossing the backward course of the approaching schooner. By the impact the schooner was damaged. The steamer was also slightly damaged. By the force of the wind, which was variably blowing from the southeast and east, and the ebbing tide, the schooner was swinging on her anchor. At the time of the collision a strong puff of wind from the east drove the schooner further westward in the channel, and she struck the steamer amidships with her davits, causing

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

some small damage to the steamer, and breaking down one of the schooner's davits with some of its rigging. During the day of the collision, the weather was unsettled, with occasional puffs of wind varying from southeast to east, and characterized by some of the witnesses, who were seafaring men, as "squally." The velocity of the wind on that day was estimated by witnesses at from 10 to 15 miles an hour, and was shown by the records of the local weather bureau to have been 17 miles an hour from 12 o'clock m. to 2 p. m.; at 2:05 p. m. 20 miles, and at 2:30 p. m. for several minutes 28 miles. These records also showed storm warnings of high east and northeast winds the afternoon and night of February 26th, and continued storm warnings in the forenoon of February 27th. The schooner was temporarily anchored where she was awaiting her assignment by the harbor master to a berth at the dock. When such is the case, it is not customary in this port to let out two anchors, except in stormy weather or in emergency; and, if this is not done, then an anchor watch should be on deck. The schooner had no second anchor out, and no anchor watch on deck at or about the time of the collision. She was anchored as near the east bank of the river as she could be anchored at the time. From the east side of the channel to the city wharf on the west side of the river is 450 feet, and what is designated as the channel is from 150 to 200 feet wide. The depth of the river from the west side of said channel to the city wharf on the west side of the river, from several hundred feet south of Dauphin street wharf to 200 or 300 feet north of same, was from 22 to 25 feet.

There was evidence that the schooner, at the time of the collision, had lapped into the channel on its east side 75 to 100 feet, and there was also evidence that she was two-thirds across the channel proper. The steamer was 420 feet (perpendiculars) long and 48½ feet beam. She was partly laden and with 18 feet 6 or 8 inches draught. She was proceeding up the river west of the center of the channel in the customary place of navigation for vessels of her class. When the lookout on the steamer, who was her chief officer, first saw the schooner, the steamer was to the southward of her down the river and about a quarter of a mile away. The schooner was then stationary. When about 60 yards distant, said lookout noticed that she was swinging around and coming astern toward the steamer. She swung to the westward in the channel with her stern a little to the north. The master of the steamer was on the bridge during her progress up the river. When he first saw the schooner she was a quarter of a mile distant, and there was nothing to indicate that she would get in the course the steamer was pursuing. It first became apparent to him that she would come in contact with the steamer or the steamer with her when he was about 200 yards of her. He then noticed the schooner was swinging around with her stern toward the west and in direction of the course the steamer was going. The master, with the assistance of the pilot, controlled the movements of the steamer. When 150 or 200 yards distant from the schooner, the pilot, with the approval of the master, starboarded the helm of the steamer, putting it about half over.

There was also evidence tending to show that if the schooner had had two anchors out, or a second anchor on deck with a watch in position to let it out in case of emergency, she would probably have been prevented from going astern into the channel, at least so far across the channel as to collide with the steamer.

There is a rule for Mobile Harbor which provides that vessels entering the port of Mobile must, on arrival in the river, rig in their jib booms, and other outriggers, etc. The rule also provides that, when permission is given a vessel to keep her jib boom and outriggers out, the vessel having such permission will be held responsible for any damage done to other vessels by them. In this case the schooner had her davits out. They were shown to be outriggers that were easily movable and taken in. She had no express permission to keep them out. But the evidence was that this rule was not enforced, and had not been for many years. So I think the nonenforcement of the rule might well be considered as a permission to keep such outriggers out. This, however, does not relieve the vessel from responsibility for any damage to other vessels by such outriggers. Rule 2, Rules for Mobile Harbor.

The schooner was not anchored in an improper place. But I am of opinion that she was at fault in omitting to anchor herself on the day of the collision in such a manner as in all probability to have prevented her swinging in, or at least from going astern across the channel sufficiently to avoid the collision. In view of the unsettled condition of the weather on that day, the course and character of the wind, being sudden and "squally," the storm warnings displayed by the local weather bureau and exhibited in the elements themselves, there was imposed upon the schooner increased vigilance in reference to her anchorage. I think, as a matter of precaution, she should have let out another anchor or had a proper anchor watch. It seems to me her situation was such as required her to use all necessary precautions to meet the uncertainties of wind and current.

A vessel at anchor in a dangerous position should take such precautions as are commensurate with the perils assumed. The Clara, 102 U. S. 200, 26 L. Ed. 145; The Sapphire, 11 Wall. 170, 20 L. Ed. 127.

Notwithstanding the error or want of proper precaution on the part of the schooner mentioned, it did not excuse the steamer from adopting every proper precaution required by the special circumstances of the case to prevent the collision. "It behooves those in charge of the navigation and movements of vessels to avail themselves of every resource to avoid not only collision, but the risk of collision." It has been said that "legislation has, for the safety of navigation, given to those in charge of ships rules as to their conduct, which will, if observed, not only prevent collision, but the risk of collision." The America, 92 U. S. 432, 23 L. Ed. 724; The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4,335.

The general rule is that a vessel under way is prima facie in fault for a collision with a vessel at anchor, although the latter is brought up in an improper place, provided the former could with ordinary care have avoided her. The vessel under way is bound to keep

180 F.—39

clear of another at anchor. This rule applies though the vessel at anchor is improperly anchored, if it is possible for the vessel under way, with safety to herself, to avoid a collision. Marsden, Coll. 544.

"The vessel in motion must exonerate herself from blame by showing that it was not in her power to prevent the collision by adopting any practicable precautions." In re D. H. Miller, 76 Fed. 877, 22 C. C. A. 597; The Virginia Ehrman, 97 U. S. 309, 24 L. Ed. 890.

The master of the steamer first saw the schooner when she was at least a half mile away. She was then at anchor and stationary. When it became apparent to him that there was risk of a collision between the steamer and the schooner, the latter was swinging into the channel and coming astern toward the course the steamer was pursuing. They were then about 200 yards apart. The steamer starboarded her helm, but put it only half over. The evidence was that in from 200 feet to 150 yards, or say 450 feet, the steamer, at the way she was going, could have deflected her course sufficiently to have passed the schooner without contact with her. The master of the steamer stated that he and the pilot thought they had starboarded her helm enough to clear the schooner and keep the steamer in deep water. The evidence showed that for several hundred feet south of Dauphin street wharf and for at least 200 feet north of said wharf there were from 22 to 25 feet of water between the course of the steamer and the wharves on the west side of the river, and that there was in fact plenty of water for the steamer to have gone to the Dauphin street wharf, at which there was no vessel lying at the time. It also appeared from the evidence that there were 400 to 450 feet from the east side of the channel to said wharf, and that the schooner, while in the channel, was not exceeding 100 feet from said east side. This would have placed her from 300 to 350 feet from the wharf, leaving, in my opinion, ample room and sufficient water for the steamer, by the exercise of due care and necessary caution, to have passed the schooner safely.

A steamer is bound to use due precaution and care and to come to a standstill by reversing her engine, if necessary, before she should collide with another vessel which she could easily see. The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687.

If it was impracticable for the steamer to have come to a standstill when risk of a collision was apparent to the master, then he should have deflected his vessel to the westward sufficiently to have avoided a collision.

My opinion is that both parties were at fault; the schooner in failing to have a second anchor out, or to have a proper anchor watch on deck, and the steamer in failing to deflect its course sufficiently to avoid the collision.

If both are in fault, the damages and costs will be divided. The Morning Light, 2 Wall. 550, 17 L. Ed. 862; Union S. S. Co. v. N. Y. & Va. S. S. Co., 24 How. 307, 16 L. Ed. 699.

And it is so ordered.