## THE MARGARET J. SANFORD.

### THE S. 11.

#### (District Court, E. D. Virginia. January 31, 1913.)

**1. COLLISION (§ 71*)—MOVING AND ANCHORED VESSEL—NEGLIGENT ANCHORAGE.**

The steamship Strathleven, 350 feet long, light, without authority from the harbor master, required by Code Va. 1904, § 2024, with a strong westerly wind blowing, anchored on the western line of the channel in Elizabeth river in Norfolk, where the channel was 800 feet wide but obstructed on the eastern side by a dredge at work. At this time a tug with two scows in tow on a hawser was approaching from upstream and only 500 or 600 feet distant. The steamship at once began to drag her anchor, and 45 fathoms of chain were paid out before she brought up, with her stern near the east side of the fairway. The tug and first scow passed safely to the east, but the second scow grazed her stern, doing some injury. The tug went as far to the eastward as was safe. Whether the steamship had stopped moving at the time of the collision was in dispute. *Held*, that in either event she was solely in fault for obstructing the channel by anchoring where she did and permitting her anchor to drag, and even paying out chain, in disregard of the right of other vessels to use the channel, and in violation of both the state law and federal Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543).

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

**2. COLLISION (§ 69*)—OBSTRUCTION OF CHANNEL—VESSEL DRAGGING ANCHOR.**

In such case the steamship was not entitled to claim the privilege of an anchored vessel as between herself and other shipping lawfully using the harbor and which had no reason to anticipate danger from the unusual and improper character of her movements.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

**3. NAVIGABLE WATERS (§ 3*) — OBSTRUCTION BY ANCHORED VESSELS — CONSTRUCTION OF STATUTE.**

The provision of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), that "it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft," the violation of which subjects both the vessel and her master or pilot to severe penalties under section 16, should be construed and strictly enforced, in the interest of safe navigation; the duty being not negatively but affirmatively and positively imposed on vessels coming to anchor in navigable channels to see that they do not under any circumstances, accidents excepted, prevent or obstruct the passage of other vessels or craft.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 3; Dec. Dig. § 3.*]

**4. NAVIGABLE WATERS (§ 3*)—RIVER AND HARBOR REGULATIONS—FEDERAL AND STATE STATUTES.**

Such act does not supersede state legislation establishing regulations for rivers and harbors which does not conflict therewith.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 3; Dec. Dig. § 3.*]

In Admiralty. Suit for collision by the Strathleven Steamship Company, owner of the steamship Strathleven, against the steam tug Margaret J. Sanford and the scow S. 11. Decree for respondents.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Hughes & Vandeventer, of Norfolk, Va., and Ralph J. M. Bullowa, of New York City, for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge. On the morning of 19th January, 1912, about 9 o'clock, the steamship Strathleven, 3,996 tons gross, 350 feet long, 52 feet 3 inches beam, and 28 feet draft, light, came up the Elizabeth river, Norfolk, Va., in charge of a Virginia pilot, and cast anchor under the beacon near the entrance to the West Norfolk channel, on the western side of the river. The wind was blowing heavily from the northwest, some 30 miles an hour, and the tide slightly flood. On the opposite, or eastern side, of the river, and a little upstream, a dredge was at work, under contract with the government. The Sanford was proceeding down the river on the eastern side of the channel, towing two loaded mud scows to the dumping grounds below Ft. Wool. The Sanford was about 80 feet long, 11 feet draft, and the scows each about 100 feet long, 35 feet beam, and draft of about 11 feet. The scows were made fast to each other by means of lines three or four feet in length, from the rear of the forward scow to the forward end of the rear scow, and were being towed on a hawser between the forward scow and the tug of some 25 fathoms. The deep water channel of the river was 800 feet wide, and the range stakes from the dredge on the eastern side of the channel extended well out in the deep water channel. The Strathleven's anchor dragged, and 45 fathoms of chain was paid out before she finally brought up on her anchor; and she drifted, or was driven across the channel, under the influence of the then prevailing wind, over to the eastern side thereof, her stern extending into the range stakes aforesaid. About the same time, while the tug and tow were thus navigating down the channel, on its eastern side, having passed the dredge, and shortly before reaching the Strathleven, it received two signals from the Maryland, a passenger steamer of some 300 feet long, coming up from behind the Strathleven, and which it had not previously observed, to pass the Sanford starboard to starboard; and the Maryland and Sanford so passed in close proximity to each other, about the Maryland's length above the Strathleven. The Maryland passed out into the range stakes, and to the extreme eastern side of the channel, the Sanford bearing as far to the eastward as possible, having regard to the presence of the Maryland, and passed the Strathleven safely, as did its forward scow, but the rear one slightly grazed the stern of the Strathleven on her port quarter, breaking, as is claimed, her propeller and shaft.

The Strathleven insists that she was in all respects free from fault and properly anchored, and that the collision occurred because of the failure of the Sanford to have a proper lookout; that she was handling a heavy and unwieldly tow on too long a hawser, which she could not properly control; and that she was grossly negligent in not so directing her navigation as to avoid collision with the steamship at anchor.

The tug insists that it was entirely free from fault, and that the collision was brought about solely: (1) By the ship's failure to keep a lookout; (2) by anchoring in an improper place, considering the condition of the weather and tide; (3) by not putting out an additional anchor to hold the steamship; (4) by putting out so much chain as to permit the vessel to tail into and across the channel, so as to materially obstruct the navigation thereof; (5) by not going ahead on her engines, to keep the vessel up to her anchorage.

Upon this statement of the circumstances of the collision, and the contentions of the respective parties, it will be readily seen that the real question to be determined is whether the accident occurred because of the improper manner and place of anchorage of the Strathleven, or from the failure of those in charge of the tug and tow to exercise proper care in proceeding down the channel, having regard to the Strathleven's position.

A large number of witnesses were examined on behalf of the parties respectively, many of whom saw the impact, which occurred in broad daylight, between 9 and 9:30 in the forenoon, most of them seafaring men, who gave intelligent accounts of just what did occur; and, while the conflict between them on some of the important questions involved is irreconcilable, as to the essential and more material facts, there is little or no difficulty in harmonizing their statements.

Ordinarily, the position of the libelant, that there is no excuse for a collision in these waters in broad daylight, with a vessel at anchor, may be conceded, and that those navigating the harbor are charged with the duty of looking out for and avoiding a collision, or the risk of collision, with a ship thus at rest; but whether the Strathleven on this occasion should be treated as a ship at rest, and the Sanford charged with the obligation of avoiding collision with her, within the meaning of the rules of navigation, is a very different proposition. On the Sanford's statement, and there is much evidence to support it, certainly that of her own master, the master of the Maryland, in a favored position to observe the vessel's movements, and that of the harbor master, who was near to the scene of the accident, there would be no doubt of responsibility for the collision, since the Strathleven's continuing to drift across the channel caused her to collide with the rear scow in the tow.

[1] In the view taken by the court, it is not necessary to determine the conflict between the parties, as to whether the Strathleven drifted into the tow or not; since the facts sufficiently establish her negligence and that of the freedom from fault of the Sanford, under the circumstances of this case, whether the Strathleven had actually ceased to drag or not. The Strathleven, light, without authority from the harbor master, and apparently without the slightest regard to the rights of those lawfully navigating the river, with a strong westerly wind prevailing, cast her anchor on the western line of the channel, and was driven across the channel, taking up nearly the entire fairway, the ship's length, and that of her hawser, being 620 feet. The harbor master, who was near by, says that the tug and tow was not more than 500 or 600 feet upstream when the Strathleven

cast anchor, and both the steamer's master and the pilot, who was in charge of her navigation, say that they did not observe the presence of the tug and tow until after the ship had brought up on her anchor; the master placing them at a ship's length away from his vessel, and the pilot about 200 yards away. The pilot also stated that this was within three minutes of the time of the collision, and that he had only stopped his engines four minutes before it occured and paid out his anchor chain up to within one minute of the time he stopped; and further that he neither looked up nor down the stream for other vessels, and had not observed the Sanford until just before the collision; and both he and the master admitted that they neither observed the tug and tow coming downstream, nor the Maryland coming up, and that no report was made to them by the lookout of the presence of either of the vessels, until seen as stated above. The harbor master, who saw and observed the ship's anchorage, properly and promptly, but not until after the collision had occurred, caused the ship to move to a proper and safe place.

Assuming that the Strathleven had the right to anchor where she did, she should have seen that her anchor did not drag, and, if necessary, put out an additional anchor or anchors (The Severn [D. C.] 113 Fed. 578; The Director [D. C.] 180 Fed. 606), and in no event should she have continued, in disregard of the rights of others, to pay out her chain in the presence of other shipping, until she virtually monopolized the channel. She had no right to assume that, upon her coming to anchor on one side of the channel, all navigation would cease; and during the time either that she was letting out her anchor chain, or fetching up on her anchor, she should have exercised the utmost diligence to have advised others of what she was doing, and, if necessary, have kicked or moved up on her engines, to prevent her unduly obstructing the fairway; and at least she should not, in such an emergency, have shut off her engines, thereby losing, instead of keeping, control of her movements.

[2] For a collision thus brought about, she is not entitled to, and cannot claim, the privileges of an anchored vessel, as between herself and other shipping lawfully using the harbor, which had no reason to anticipate danger arising from the unusual and improper character of her movements. Culbertson v. The Southern Belle, 18 How. 584, 587, 15 L. Ed. 493; The Clara, 102 U. S. 200, 202, 26 L. Ed. 145; United States v. Transportation Co., 184 U. S. 247, 255, 22 Sup. Ct. 350, 46 L. Ed. 520; Marsden on Marine Collisions (6th Ed.) 479, and cases cited; Spencer on Marine Collisions, §§ 99, 106; Hughes on Admiralty, 261, 262.

The obstruction of the channel, in the view taken by the court of this case, was in plain contravention as well of the state statutes and harbor rules and regulations applicable to the waters in question, as the federal statute on the subject. Section 2024 of the Code of Virginia prescribes the duties of harbor masters, as follows:

"Duties of Harbor Masters; Port Regulations.—Each harbor master shall cause every vessel coming within his jurisdiction, to moor as soon as may be, and at such place as he may judge best for the general safety, not being within fifty fathoms of any wharf or other vessel; * * * and shall

require the masters of all vessels, as soon as may be, after coming to anchor or hauling to any wharf, if he deem it necessary (not exceeding twenty-four hours), to rig in his jibbooms and all fore and aft spars, and to top or brace up sharp his lower and topsail yards, so that the passage of other vessels and steamboats or ferryboats shall not be obstructed; he shall attend to the unmooring of any vessel, and if by stress of weather or any accident any vessel be driven from her moorings, he shall attend to the remooring of her. * * * "

And sections 3 and 6 of the rules and regulations of the board of harbor commissioners of the port of Norfolk, Portsmouth and Norfolk county, under the head of "Their Duties," are as follows:

"(3) They are vested with authority to designate the anchorage grounds of all vessels, and are required to keep the channel way and track of steamers clear."

"(6) The harbor masters must see that the regulations forbidding vessels from anchoring in or obstructing the channelway, and all other regulations herein contained are strictly observed, and in so doing they may board any vessel, speak her, or adopt any course that they may in their discretion deem best to carry out this object."

And section 5 of the rules governing the use of the waters of the harbor is as follows:

"(5) Vessels entering the harbor and intending to come to anchor or dropping out from wharves or docks preparatory to departure, must anchor under direction of a harbor master, and are forbidden to anchor in the channel."

This state statute, and the harbor rules and regulations in question, make clear the duties of harbor masters; they are specifically required to cause vessels to be properly moored, and to see that the regulations forbidding vessels from "anchoring in, or obstructing the channelway," are strictly observed. And the board of harbor commissioners is vested with authority to designate the anchorage grounds of all vessels, and is required to keep the channelway and track of steamers clear.

While in this port no specific anchorage grounds have been designated, nor, may it be said, adopted by special usage, notwithstanding the crowded condition of the channel, still it is entirely within the power of the board of harbor commissioners to establish such anchorage grounds, and to do what is reasonably necessary to keep the channel or fairway open for the purposes of commerce. These local laws and regulations are valid and enforceable in courts of admiralty, as well as in the local courts (United States v. Transp. Co., supra, 184 U. S. 247, 255, 22 Sup. Ct. 350, 46 L. Ed. 520, and cases cited), and certainly, so far as they are in aid and furtherance of the purpose of commerce, the courts of admiralty, as respects maritime matters, will carry out and enforce the same.

[3] The federal statute referred to (Act of Cong. March 3, 1899, c. 425, 30 Stat. 1152, 1153, §§ 15, 16, 17 [U. S. Comp. St. 1901, pp. 3543, 3544]) is quite comprehensive. Section 15 provides:

"That it shall not be lawful to tie up, or anchor vessels or other craft in navigable channels, in such manner as to prevent or obstruct the passage of other vessels or craft."

And section 16 imposes a penalty not only upon navigators who obstruct channels, but upon the vessels also; and section 17, among other things, prescribes the method of enforcing the provisions of the act.

The interpretation placed upon this act of Congress (The Job H. Jackson [D. C.] 144 Fed. 896, and authorities there cited) has not tended to give to the statute its real force and effect, and certainly that which its importance demands. In Hughes on Admiralty, a work of recognized value and authority, published shortly after the passage of the act, will be found an interesting and able discussion of the subject, the gist of which is that by the act vessels are forbidden from completely obstructing the channel, or so obstructing it as to render navigation difficult. This view of the act has been taken by several of the District Courts—whether correctly or not this court is not prepared to concede, the vice in the interpretation being that it largely nullifies, or fails to give any effect to the statute. It accords to moving and anchored vessels the same relative rights and privileges as respects the use of the channel or fairway, and enables those at rest to occupy any part of it desired, forcing those moving to pick their way through as best they can. Without the act, vessels could neither completely obstruct channels, nor make their navigation difficult, except at their peril in answering in damages to those injuriously affected thereby. Under the interpretation thus given to this act, it has to all intents and purposes in this vicinity been a dead letter, and no one has given heed or attention to its positive commands. The true meaning of the act, the court thinks, is that under it the duty is not negatively, but affirmatively and positively, imposed upon vessels coming to anchor in navigable channels, to see that they do not under any circumstances, accidents excepted, "prevent or obstruct the passage of other vessels or craft"; not, of course, that they shall not anchor in such channels at all, but that when they anchor therein, outside of an established anchorage ground, they shall so anchor, and in such method, as not to close, or unduly or unreasonably prevent and obstruct, the passage of other vessels or craft.

This would cause no hardship on any one, and is the fair and reasonable meaning of the law, since its purpose and intent, manifestly, was in aid and furtherance of the ends of commerce; that is, to keep open, and not to close up, the rivers and water courses of the country. Ships "must go on" in their business, and, while they of necessity frequently stop or tie up, when so doing they have as a rule many choices of location, and they can deliberately set about either to find such place as will within itself be secure, or adopt such method of protection as will save them from all harm, always having in view that the path of commerce should be kept open, and that those unnecessarily or unduly obstructing it do so at their peril, and subject themselves to the penalties of possible fine and imprisonment. This was certainly the view taken by the court of the act, in The Minnie, 100 Fed. 129, 40 C. C. A. 312; a decision of the Circuit Court of Appeals of this circuit, and not that the law was without meaning or incapa-

ble of being enforced, and to be more honored in its breach than its observance.

Adopt the view herein suggested, and let the act be enforced, and those navigating the waters of the United States will quickly adjust themselves to the same, and by apparent concert of action so come to anchor as to leave open a general and well-defined path or fairway, through which all vessels can easily navigate, and not drop anchor here and there and at most any place in midchannel or on either side of the stream, in such manner as to make it next to impossible for those passing to work their way through the alternating obstructions placed in their way. That this must have been the purpose of Congress is manifest from the heavy punishment imposed for violation of the act, and the vigorous and summary method prescribed for its enforcement.

By section 16 of the Act of March 3, 1899, 30 Stat. 1121, 1152, et seq., it is provided:

"That every person and other corporation that shall violate or that shall knowingly aid, abet, authorize or instigate a violation of the last-named section, shall be guilty of a misdemeanor, and on conviction thereof shall be punished by fine not exceeding two thousand five hundred dollars, nor less than five hundred dollars, or by imprisonment (in case of a natural person) for not less than thirty days, nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving the information which shall lead to the conviction; and any and every master, pilot and engineer, or person or persons acting in such capacity, respectively, on board of any boat or vessel who shall * * * willfully obstruct the channel of any waterway in the manner contemplated by section * * * 15 of this act, shall be deemed guilty of a violation of this act, and shall, upon conviction, be punished as hereinbefore provided in this section, and shall also have his license revoked or suspended for a term to be fixed by the judge before whom tried and convicted. And any boat, vessel, scow, raft or other craft used or employed in violating any of the provisions of sections * * * 15 of this act, shall be liable for the pecuniary penalties specified in this section, and in addition thereto, the amount of damages done by said boat, vessel, scow, raft or other craft, which latter amount shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and that said boat, vessel, scow, raft or other craft may be proceeded against summarily by way of libel, in any district court of the United States having jurisdiction thereof."

And section 17:

"That the Department of Justice shall conduct the legal proceedings necessary to enforce the foregoing provisions of sections nine to sixteen inclusive of this act, and it shall be the duty of all district attorneys of the United States to vigorously prosecute all offenders against the same, whenever requested to do so by the Secretary of War, or any of the officials hereinafter designated; * * * and for the better enforcement of the said provision, and to facilitate the detection and bringing to punishment of said offenders, the officers and agents of the United States in charge of river and harbor improvements, and the assistant engineers and inspectors employed under and by authority of the Secretary of War, and the United States collectors of customs and other revenue officers, shall have power to swear out process, and to arrest and take into custody with or without process, any person or persons who may commit any of the acts or offenses prohibited by the aforesaid sections of this act, or who may violate any of the provisions of the same; provided that no person shall be arrested without process for any offense not committed in the presence of some one of the afore-

said officials; and, provided further, that whenever any arrest is made under the provisions of this act, the person so arrested shall be brought forthwith before a commissioner, judge, or court of the United States, for examination of the offense alleged against him, and such commissioner, judge or court shall proceed in respect thereto as authorized by law in cases of crime against the United States."

The court has enlarged somewhat upon the law, national and state, and the local ordinances, in force at the scene of the collision, for the reason that their enforcement has become a necessity, having regard to the importance of the harbor of Hampton Roads and vicinity, and the congested condition of many places within the waters of the Elizabeth river and the harbors of Norfolk and Portsmouth. The present case is but an illustration of those that not infrequently arise in the court, and that are of almost daily occurrence, within one's everyday observation. In the waters of Hampton Roads there is ample room for vessels of the deepest draft to anchor on either side of the channelway, leaving open a fairway in the middle of the stream, and perhaps to anchor in the center, leaving room on either side; though, confessedly, it would be safer and better to use one side as an anchorage ground, and leave the other open for free navigation, and within the waters of Elizabeth river, and in the harbors aforesaid, sufficient room exists for anchorage purposes, by using one side of the stream, and allowing the other to remain open, and not permit anchorage to be had wherever it may occur to the particular navigator as the most convenient place for his vessel.

Of course, these anchorage grounds would have sometimes to be located on one side of the channel, and then on the other, dependent upon the sinuosities of the channel, and the usual courses of navigation thereof, as well as because of docks and piers on either side of the river, or within the harbors; but this is mere matter of detail. Within these waters, certainly at the places where the congestion chiefly exists, ample room for anchorage purposes will always be found reasonably near by, if not at the particular spot or location where it would be most desirable from the viewpoint of economy and expedition for vessels to anchor, while waiting turn either to coal, or to load or unload, or for any other purpose, and it should be considered no great hardship on vessels anchoring in a channel, to move or change position, as may be found convenient for them, or the necessities of business require. As before stated, the board of harbor commissioners has full authority to establish anchorage grounds within their jurisdictions, which has been done at Newport News, where light vessels are required to anchor above the Old Dominion Land Company's Pier A, and all loaded vessels below pier 12, each well to the west side of the channel, and not less than 2,000 feet from the piers, and, in the court's judgment, the advantages to this port and the purposes of commerce would be greatly benefited by their so doing; but, whether they do so or not, the federal statute, supra, should be strictly enforced, and carried out by those charged with its execution.

[4] The further suggestion is made that perhaps the state law has been superseded by the passage of the federal legislation in question. This view is not without force, since ordinarily legislation by the fed-

eral government upon a subject within its control is deemed exclusive of other authority, and this is clearly a subject within the dominion of federal legislation. Gibbons v. Ogden, 9 Wheat. 1, 98, 196, 6 L. Ed. 23; Brown v. Maryland, 12 Wheat. 419, 446, 6 L. Ed. 678; Brown v. Houston, 114 U. S. 630, 5 Sup. Ct. 1091, 29 L. Ed. 257. While this is the general rule, the language and scope of the national act would largely determine its purpose, and the intent of the Congress in passing it, and whether it was really meant that all local legislation should be set aside. Other sections of the act under discussion, March, 3, 1899, supra, having to do directly with rivers and harbors, the establishment of harbor lines, the granting of permits by the Secretary of War to build out into the navigable waters of the United States, have been the subject of review by the Supreme Court (Cummings v. Chicago, 188 U. S. 410, 428, 430, 23 Sup. Ct. 472, 47 L. Ed. 525; Montgomery v. Portland, 190 U. S. 89, 23 Sup. Ct. 735, 47 L. Ed. 965); and the contention was there as here made, but the court ruled that it was not the purpose of Congress to take away from the state the right to control its internal waterways, and that the true meaning of the act was that both governments should act conjointly therein, and hence that the legislation was not exclusive of the power and authority of the local governments in the premises. See, on this general subject, also, Gilman v. Philadelphia, 70 U. S. (3 Wall.) 713, 18 L. Ed. 96; Pound v. Turck, 95 U. S. 459, 462, 24 L. Ed. 525; Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629.

This, although navigation may be said to be a subject more particularly within the federal domain, in the view of the court, is the proper interpretation of the sections of the act under consideration here; and hence, that the two governments, and their officers, under existing legislation, can and should join or vie with each other in the effort to see that the same are enforced and respected, regarding these important matters.

The difficulty of preventing collisions in narrow channels is necessarily great, and hence the strictness of the law referred to above; and those lawfully using the waters should do so having regard to the high duty they owe to others, which obligation is not only recognized and enforced by the general maritime law, but especially enjoined by the statutes, state and federal, before mentioned. On this occasion, the Strathleven having plainly failed to perform the duty imposed upon her by maritime practice and the rules of good seamanship, she must bear any loss resulting therefrom.

In what has been said, the court is not unmindful of the privileges accorded to anchored vessels. All that is said in that respect is fully approved, and the authorities cited recognized; and the burden imposed upon the tug and tow, the moving vessel on this occasion, as well to avoid the risk of collision, as the collision, assuming the steamer to have been at rest, is undoubted. Still the court can but believe that the Sanford met the burden imposed upon it; the real question being whether she exercised reasonable maritime skill and caution in continuing to navigate on the eastern side of the channel, in the face of the

Strathleven having cast anchor to the westward line of the channel. In a word, had not the Sanford the right to assume that the Strathleven, anchored on the western side of the channel, would not disturb her in her navigation on the eastern line thereof? The court clearly thinks that she had such right, especially under the circumstances of this case, and that, moreover, having regard to the presence of the dredge, and meeting the steamer Maryland, she did all that good seamanship required of her, and that any error committed by her after the presence of danger or possible danger from the movement of the supposed anchored ship across her course became obvious should be treated as error in extremis. She ported her wheel and went to starboard as far away from the supposed anchored vessel as possible, and as far as it was practicable to go, having regard to the presence of the Maryland then meeting her. Indeed, the only criticism that seems to be especially made of her course, by those navigating the Strathleven, is that, if she had reversed her engine, she might have been driven away by the wind and tide from, and not have come into, collision with the steamer. Assuming that she should have so checked up and drifted, instead of porting and going ahead, it was a matter for the exercise of wise judgment, at the moment, and while we do not know what would have been the result of slowing down, and the drifting process suggested, we do know that both the tug and forward scow passed the Strathleven safely; and the latter scow barely touched her in the collision; and the court thinks it equally clear that it was not practicable for the tug and tow to have navigated to the westward and around the stem of the Strathleven, as one or two of libelant's witnesses contended might be done.

It follows, from what has been said, that the Strathleven is solely responsible for the collision, and a decree to that effect will be entered when presented.