## THE BARGE NO. 4.

### THE DELMAR.

#### (District Court, E. D. Virginia.   March 7, 1918.)

1. COLLISION ⬤57—HARBOR RULES—ENFORCEMENT.

Rules and Regulations of the Board of Harbor Commissioners of the Port of Norfolk, Portsmouth, and Norfolk County, § 18, declaring that no tows exceeding 700 feet in length shall enter or depart from the harbor, is valid and enforceable in courts of admiralty, as well as in state courts, particularly as it is in furtherance of the purposes of commerce.

2. COLLISION ⬤57—RULES—APPLICABILITY.

The regulations duly promulgated under Act Cong. May 28, 1908, c. 212, 35 Stat. 428, limiting the length of hawsers on tows of seagoing barges navigating in the inland waters of the United States to 75 fathoms, are applicable to a tow en route from Port Norfolk to Cape Charles, which has to cross Chesapeake Bay, which at that point is over 20 miles wide, and meets the waters of the Atlantic Ocean.

3. COLLISION ⬤66—PROCEEDINGS—EVIDENCE AS TO FAULT.

On libel against a tug and barge in tow for collision, evidence *held* to show that a proper lookout was not maintained, either on the tug or

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the barge, and that, if such lookout had been maintained, the accident could have been avoided.

4. COLLISION ⊛⇒61—LIBELS—RESPONSIBILITY.

A tug and barge in tow *held* wholly responsible for a collision with a motorboat; the tow being in violation of regulations prescribed under 'Act Cong. May 28, 1908, c. 212, as well as local harbor regulations, and neither the tug nor the barge maintaining a proper lookout. Hence, as the occupants of the motorboat were drowned, responsibility cannot be escaped by attributing the fault to the motorboat.

5. COLLISION ⊛⇒139—DAMAGES—DEATH OF PERSON INJURED.

As a result of a collision for which a tug and barge in tow were wholly liable, four respectable colored people were drowned, the launch in which they were riding being capsized and sunk. Of the four, two were men and two young women, about 16 years old, one of whom, as a nurse, earned $2 a week. The master and owner of the launch was a negro of exceptional honesty and character, 45 years old, married, and the father of a large family. He was in good health and earned $3 a day. The other man, who worked steadily at his trade, at which he earned $2.50 a day, was 29 years of age, married, and the father of three small children. *Held*, that $7,500 should be awarded for the loss of the life of the master, $4,500 for the death of the other man, while $1,500 each should be awarded for the deaths of the two women.

6. COLLISION ⊛⇒133—DAMAGES—DESTRUCTION OF VESSEL.

Where a gasoline launch, about 30 feet long, 6 feet broad, and 3½ feet deep, with a wooden house or cabin extending from a point about 6 feet abaft the stem, and extending aft to a point about 6 feet from the stern, for which the master had paid $1,000, was sunk as the result of a collision wholly the fault of a tug and barge in tow, an award of $600 was proper.

In Admiralty. Libel by Lillie Wilkins, administratrix of the estate of Alexander Wilkins, deceased, against the New York, Philadelphia & Norfolk barge No. 4, and the steam tug Delmar, to recover for loss of life caused by collision, in which the administrators of Edward Bishop and others intervened. Decree for libelant and petitioners.

This libel was filed to recover for loss of the life of Alexander Wilkins, on the 29th day of October, 1916, about 6 o'clock p. m., caused by a collision at a point northerly of and in the vicinity of the can buoy at the entrance to the West Norfolk channel from the main channel of the Elizabeth river, Norfolk, Va., between an unnamed gasoline launch, in which the deceased, Edward Bishop, Elizabeth H. Simmons, and Lubertia Howell were at the time, and barge No. 4, with 28 loaded railroad freight cars on board, in tow of the tug Delmar, whereby the launch was capsized and lost, and the four persons on board drowned. Administrators for the three persons named, other than the libelant, filed their petitions in said libel case, under the rule.

The gasoline launch was about 30 feet long, 6 feet broad, 3½ feet deep, with a wooden house or cabin extending from a point about 6 feet abaft the stem, and extending aft to a point about 6 feet from the stern, and at the time of the accident, was in charge of Wilkins, her owner and master, and Bishop was acting as engineer. Barge No. 4, designed for the transportation of railroad freight cars between Norfolk and Cape Charles, is 340 feet long, 50 feet broad, and 1,174 tons net register, and was being towed on a hawser of some 80 or 90 fathoms long, by the steam tug Delmar, 112.3 feet long, 26.9 feet broad, and 11.7 feet deep, and 130 tons net register, 294 tons gross.

The libelant alleges that on the date named the launch was proceeding, at about 6 miles an hour, up the Elizabeth river to the westward of the channel, bound for Norfolk, the course of the launch being in a general southeasterly direction, parallel to the main channel extending between Lambert's Point and Pinner's Point; and the Delmar, with the barge in tow, was proceeding

⊛⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from the New York, Philadelphia & Norfolk terminal at Port Norfolk, bound for Cape Charles. As the tug proceeded out of the West Norfolk channel, and began to shape her course for the northward, the launch stopped her engines, and waited for the barge to follow the tug; but, instead of doing so, it made a shorter turn than the tug, and took a course to the westward of the can buoy at the entrance of the West Norfolk channel, heading in the direction of said launch, which was drifting under the influence of a strong flood tide. The launch immediately proceeded to back to avoid the barge, but the latter swung in towards the launch faster than the launch could get away, so that the cable from the barge to the tug caught the bow of the launch, tipping it over on its port side, where it lay until the forward part of the barge struck it, and carried it under water, drowning all on board, and the launch was a total loss. At the time of the collision the weather was cloudy and calm, and the tide flood.

The libelant charges the following faults against the Delmar: That she was navigating in the harbor with a tow which, including the length of the Delmar, exceeded the length of 700 feet, contrary to the harbor regulations, the hawser being 540 feet long; that she was not manned by a competent master and crew; that she was navigated without a competent lookout properly stationed and attending to his duties; that she was proceeding at an illegal rate of speed and on the west side of the channel, and that she did not observe the launch lying to the westward of the channel, and the course of her tow, in time to take precautions against running down the launch—and further charges as faults against the barge that it was not managed by a competent master and crew; that it did not have a competent lookout, properly stationed and attending to his duties; in that it was part of a tow which, including the length of the Delmar, exceeded 700 feet, and navigated in the harbor of Norfolk; that it did not follow the course of the Delmar, but steered to the port and westward of the can buoy at the entrance of the West Norfolk channel, and thereby without warning ran down the launch, which was waiting for it to pass on the course of the tugboat; and that, when the collision became imminent, the towing hawser was not turned loose from the barge, as it easily could have been.

The respondent admits collision with a gasoline launch at about the time stated in the libel, but contends that it occurred in the main channel of the Elizabeth River, nearly opposite black spar buoy No. 11, and denies generally the facts relating to the collision as alleged in the libel, and particularly charges that the launch, before and when it passed the Delmar, was proceeding up the river on the extreme eastern edge of the channel, the Delmar at the time proceeding out of the West Norfolk channel, and shaping her course to the northward, so as to keep to the starboard side of the main ship channel, after passing Lambert's Point piers. It also denies that the barge did not follow the tug, or that it headed in the direction of the launch, or that the launch was drifting under the influence of a strong flood tide, and alleges that the tug, proceeding down the channel on her usual and proper course, with the barge following in her wake, passed the launch starboard to starboard, when about opposite the merchandise piers at Lambert's Point, the launch at that time being several hundred feet to the eastward of the tug, and well over on the eastern side of the main ship channel, the launch and tug having interchanged "salute" whistles, when about abreast of each other. Shortly afterwards, the tug heard distress signals from the barge, then observed that the launch had suddenly, unexpectedly, and without warning, changed her course in the wake of the tug; that the bow of the launch struck the forward end of the barge, and immediately sank; that nothing could have been done, either on the part of the tug or the barge, to avoid the collision, and no other maneuver was possible, save to stop the tug's engines, which was done.

Respondent also charges that the launch was at no time on the port side of the tug or barge, but, on the contrary, that she was far to starboard; that the launch was navigated by unskillful, unlicensed, and negligent navigators; that she was not in charge of an experienced and careful master; that she had no efficient lookout properly stationed; and, further, that the decedent, Wilkins, being master of and in charge of the launch's navigation, was guilty

of negligence contributing to the collision, which is a bar to a recovery by his administratrix herein.

John W. Oast, Jr., and R. T. Thorp, both of Norfolk, Va., for libelant and petitioners.

Thomas H. Willcox and Floyd Hughes, both of Norfolk, Va., for respondents.

WADDILL, District Judge (after stating the facts as above). From the above statement of the case, it will readily be observed that the parties are utterly at variance as to how the accident occurred, and where the collision took place. Libelant insists that the launch in which decedents lost their lives approached from the West Norfolk side of the channel, and was in collision with the barge on its port side; and the respondent, that the launch approached on its starboard, the Norfolk, or eastern, side of the channel. Respondent asserts that the collision occurred at a point about opposite Merchandise Pier No. 2, at Lambert's Point; whereas, libelant says it took place something higher up the river, between that point and spar buoys 32 and 32a. These differences will be discussed later, and the court will first consider the charges of negligence against respondent as to the undue length of the tow, and especially the hawser, the inefficiency of the navigators of the tug and tow, and the failure to have efficient lookouts upon the tug and barge.

[1] First. The collision occurred within the harbor limits of the city of Norfolk. Section 18 of the Rules and Regulations of the Board of Harbor Commissioners of the Port of Norfolk, Portsmouth and Norfolk County, in effect at the time of the happening of the occurrence, prescribes that no tows "exceeding 700 feet in length shall enter or depart from the harbor." This rule is valid and enforceable in the courts of admiralty, as well as in the state courts, and certainly, so far as the same is in furtherance of the purposes of commerce, it should be observed, respected, and enforced by the courts of admiralty. The United States v. St. Louis, etc., Transp. Co., 184 U. S. 247, 254, 255, 22 Sup. Ct. 350, 46 L. Ed. 520; The Margaret J. Sanford, The Strathleven (D. C.) 203 Fed. 331, 335.

[2] Under regulations duly promulgated under the act of Congress of May 28, 1908 (35 Stat. 428, c. 212), hawsers on tows of seagoing barges navigating in the inland waters of the United States are limited in length to 75 fathoms, and should in all cases be as much shorter as the weather or sea will permit. The tow, as well as the hawser in use at the time of the collision, were both greater in length than prescribed by the state and federal statutes. The tug was 129 feet long, the hawser 90 fathoms, or 540 feet, and the barge 340 feet, making more than 1,000 feet for the entire tow, which exceeded the local regulation by 300 feet, and the hawser 15 fathoms, or 90 feet, longer than allowed by the federal statutes.

The suggestion is made that the federal statute has no application, because the tow was not intended to go to sea. This contention is more technical than real, as the tow was en route from Port Norfolk to Cape Charles, having to cross Chesapeake Bay, over 20 miles wide,

where the waters of Hampton Roads, Chesapeake Bay, and the Atlantic Ocean meet, and combined form substantially the open sea. Moreover, if neither the harbor rules nor the act of Congress prescribed or regulated the length of tows and hawsers, ordinary prudence, maritime skill, and good seamanship would suggest the impropriety of operating a tow and hawser of the length in question here, in passing from Port Norfolk channel out and through an exceedingly narrow and circuitous course, extending from the point of departure at Port Norfolk to and beyond Lambert's Point, and which was almost constantly crowded with shipping, and doing so was a menace to navigation. The safer, if not the only, course would have been for the tug to have made fast alongside of the car float, where it could promptly and effectively control the barge's movements, and at least its hawser should have been most materially shortened, towed as it was. Rules and Regulations of Board of Harbor Commissioners, § 18; Act Cong. May 28, 1908, c. 212, § 14, 35 Stat. 428 (Comp. St. 1916, § 7969), and regulations duly promulgated pursuant to the statute of December 7, 1908; United States v. Transp. Co., 184 U. S. 247, 22 Sup. Ct. 350, 46 L. Ed. 520, supra; The Jamestown (D. C.) 114 Fed. 596; The Manhattan (D. C.) 181 Fed. 229, 233; The Margaret J. Sanford (D. C.) 203 Fed. 331; The Teaser (C. C. A.) 246 Fed. 222; The Dorset (this day decided, March 7, 1918) 250 Fed. ——.

[3, 4] Second. The libelant charges that the tug was not manned by a competent master and crew, was without a lookout, and navigating at an improper speed, and that the barge was not in charge of a competent master and crew, and did not have a lookout properly stationed, and that the barge failed to follow the course of the tug. These charges are not infrequently formally made. In this case, both as respects the tug and barge, they become most material. The navigation was at night, over a circuitous course, in a busy channel, and the tug was admittedly without a lookout. The master says that he alone was in the pilot house, that he did not carry a lookout over this part of the course, and acted both as master and lookout, and he had one deck hand, who was aft on the port side of the tug fixing the lines. He further admitted that his duty required him frequently to look backward in order to observe the course and movement of the barge.

Considering the navigation of the barge, on the occasion in question, we have only the testimony of one person from her, namely, the head fireman, who was in charge of her navigation, her master being absent. He seems to have been aided by an assistant fireman, who was in the engine room, and a deck hand whose whereabouts in the barge he did not know. The barge was equipped with a bridge, running from one side to the other, and sufficiently high to permit the passage of freight cars beneath it. At each end of the bridge was a house, or quarters for the accommodation of the crew, and in the middle was the pilot house, from which the operation of the barge was directed. This acting captain was an unlicensed man, who said he had never qualified for license to run or steer boats, "or anything of that sort." He was acting as lookout, as well as master, and admits that he was the

only lookout on that occasion. In his position in the pilot house on the bridge of the barge, he was not so located as to be an efficient lookout, even assuming that he could perform the services of master, pilot, and lookout at the same time, and he concedes it was impossible from where he was to see objects or small craft on the waters, in close proximity to the car float, over the tops of the cars. Manifestly, this barge master was inexperienced, and it was impossible for him to perform the treble functions required of him. Moreover, as is evident from the result in this case, good seamanship required, while operating tows of this character over the course in question, that a lookout should be stationed upon the forward end of the barge, immediately over the water, from which position he could see and observe objects ahead, and from either side, from which danger might be anticipated. The Vedamore, 137 Fed. 844, 70 C. C. A. 342. Had such lookout been so stationed, this little gasoline launch, from whatever direction it appeared, would have been seen, and could have been readily warned off, as it was only 30 feet long, and could almost certainly, in her own length, have swung around and away from the impending peril in which it had been entrapped. Besides, a lookout so stationed could, as shown by the testimony, have released the trigger, thrown off the hawser, and dropped it overboard. The collision could thus have been avoided, regardless of whether the launch approached the car float on its starboard or port side. The Colorado, 91 U. S. 692, 698–701, 23 L. Ed. 379; The New York, 175 U. S. 204, 20 Sup. Ct. 67, 44 L. Ed. 126; The Michigan, 63 Fed. 280, 287, 288, 11 C. C. A. 187; The Vedamore, 137 Fed. 844, 70 C. C. A. 342; The Viking (D. C.) 201 Fed. 424, 427; The Wilbert L. Smith (D. C.) 217 Fed. 981, and cases cited; Rules of Navigation, art. 18, Act June 7, 1897, c. 4, § 1, 30 Stat. 100 (Comp. St. 1916, § 7892).

Third. This brings us to the question of whether the collision occurred as contended for by the libelants, or as insisted upon by the respondents; and it may be said that it is more or less difficult to determine the exact manner and place of the happening of the accident, because the actors therein on one side are no longer living to give their account of what occurred. The four persons on the launch were all suddenly drowned, and the craft in which they were traveling sunk and destroyed, and never afterwards found.

The libelants were enabled to call a disinterested witness, who was near the scene of the accident, crossing the harbor, and who made a report of the occurrence. He was passing from West Norfolk to Lambert's Point in a rowboat, and claims to have seen and observed the accident. He describes it as having happened on the western side of the channel, higher up the river than as contended for by respondent, and the tug as having gone to the eastward of the buoy at the entrance to the West Norfolk cut channel, and the barge to the westward thereof.

Respondent insists that it has broken down the testimony of this witness, and that his evidence cannot be relied upon. In this view the court does not concur, save as respects the location of the accident and the going of the tug to the eastward of the buoy at the mouth of

the cut channel. As to these the witness is most likely mistaken, and probably confused one buoy with another, which he might readily have done, crossing a large sheet of water in the dark. The four buoys involved, namely, spar buoy 4, nun buoy 2, and spar buoys 32 and 32a, all in small area, might naturally have been mistaken one for the other. With these exceptions his testimony seems to be entirely clear and positive, and is not without support from disinterested witnesses offered by the respondent, namely, the master of the C. & O. tug, and the master of the tug Clark, whose vessels were in the vicinity at the time. This witness evidently confused spar buoy 32a, at the mouth of the West Norfolk cut, with nun buoy No. 2, as the one around which the tug passed to the eastward, in the direction of the deep water channel, and then angling up at that point, and the failure of the barge to follow in the wake of the tug; or he had reference to the maneuver of the tug after it had proceeded a little further down stream, and made its departure at the curve in the channel just below spar buoy No. 32. If the gasoline launch was to the westward of mid-channel, as claimed by this witness, and the accident occurred as he claimed, it would naturally have taken place upon the tug's making its departure, after rounding either one or the other of the two buoys indicated.

The court is inclined to believe, from the whole testimony, that the collision took place nearer the point claimed by the respondent than that by the libelant, namely, off the merchandise piers at Lambert's Point, and after the tug made the last-named departure. The first witness called by the respondent, C. T. Powell, the master of the C. & O. car float, when giving his direct statement, comes pretty near placing the launch where the libelant's witness Jones says it was; that is, to the westward of the car float. It is true, on examination by counsel, he subsequently placed the launch to the eastward of the barge, though his last statement is greatly weakened by what he first stated; and the testimony of the master of the tug Clark, also called by the respondent, and who was also in the immediate vicinity of where the launch would have been, if to the eastward of the barge, as claimed by the respondent, saw nothing whatever of it. The testimony of these two disinterested witnesses corroborates that of libelant's witness Jones as to the location of the launch to the westward side of the barge. In the view of the court, in the result it is not very material whether the collision occurred at the exact place or precisely as claimed by either party; and it is inclined to think that the preponderance of the testimony is to the effect that the launch was to the starboard side of the car float at the time of the collision.

Assuming this to be the fact, the court sees no reason why the collision should have occurred, had the tug and tow been navigating prudently, as well respecting the length of the tow and hawser, and the presence of a proper lookout, as in the matter of the speed with which it was proceeding.

Fourth. Considering just how the collision occurred, after the launch passed the tug at a distance of some 100 feet away, and subsequently came into collision with the starboard end or side of the barge, as described by respondent's witnesses, especially by the master of the

barge and the fireman from the Delmar (the last named, who claims to have been standing on the starboard side of the Delmar, and saw and observed all that occurred), it may be said that their version of the affair is highly improbable. The last witness, Moore, testified:

"And after she passed the boat, and hauled out for the stern of the boat, like she was going across the stern between the barge and the tugboat, and it looked to me like she had got so near the stern of the boat that she seen the cable, and she tried to haul her back, and she did not have time to haul her back, and she went bow on to the barge. Q. Which side of the barge did she hit? A. The starboard side, the corner."

The acting master of the barge, Hudgins, thus described it:

"A. The launch come back to the Delmar, and changed her course apparently to cross our hawser between the barge and the tug, and I reached for the whistle, which was right over my head, and before I got hold of it the launch had changed her course again, and showed me her green light. Q. What did you do then? A. I took my hand down, and immediately the launch switched her course again, and showed me her red light, and headed across the hawser, and I got hold of the cord and blew the danger signal. Q. What did the launch do? A. She did not do anything, unless she hit herself behind the barge. Q. Do you know where she was hit? A. Between the end and the starboard quarter of the barge."

The testimony is undisputed in this case that the navigator and owner of the launch was an experienced water man, had spent years in the shipyard business and handling launches, and to suppose that he would have been guilty of such folly as this testimony shows it to have been, with friends aboard, is most improbable; in other words, that he came up within 100 feet of the tug, and with the car float following behind, with its lights burning, saluted the tug as he passed, and immediately proceeded to navigate around behind it, and between it and its tow, and into the hawser of the tow, first showing his red and then his green light. Such action on his part meant sudden destruction; when he could, if the situation was as claimed by these witnesses, have simply starboarded his helm, and in an instant gone away from, and not into, either the car float or the hawser. It seems to the court entirely manifest that, if the collision did occur from the starboard side, as claimed, it was at a time when the tug had made its departure at the curve in the channel, and in the immediate vicinity of where the collision occurred, in a northeasterly direction, and that at the moment the car float, some 200 yards away in the dark, had not changed its course to follow in the wake of the tug, but was moving apparently in a northwesterly direction, and the launch was caught in the angle, as the car float, upon the long hawser, began to be affected by the pulling of the tug, and curved into and upon the launch, striking it with its starboard bow.

The respondent's witness Moore gives strong support to this contention, as follows:

"Q. Had you been up long enough to see whether the barge was following right behind the tug? A. It was following as near behind the tug as she could, coming round."

And later on:

"Q. Was the barge kind of turning round, or was it straight behind the tug? A. It was straightening behind the tug, but not directly straight. Q.

Was it a kind of going over to port a little? A. Going from the launch over to the left."

With a view of showing how this accident happened, the court has gone somewhat into detail, conscious of the fact that it is difficult to determine with certainty, especially where the actors on one side are all dead. The conclusion reached is that the real cause was the manner in which the tug and tow were being navigated at the time. The tow was confessedly of undue length; on an improper hawser; both tug and barge without proper lookouts, and proceeding at an unsafe rate of speed, at night, along a difficult course, in plain violation of the laws, statutes, rules, and regulations prescribed for their movement, and contrary to what good seamanship would have suggested; and as a consequence the gasoline launch, on which the libelant's and petitioners' intestates were lawfully traveling, was caught, run down, and all on board lost. The negligence on the part of the respondent was sufficient within itself to, and does, account for the accident, and those liable therefor will not be permitted to cast the responsibility upon others, or have them share their burden, by suggesting possible faults of those whose voices are still, when their own acts of omission and commission fully account for the disaster. The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148; The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Martello, 153 U. S. 64, 74, 14 Sup. Ct. 723, 38 L. Ed. 637; Lie v. San Francisco, etc., Steamboat Co., 243 U. S. 291, 298, 37 Sup. Ct. 270, 61 L. Ed. 726; The Georgetown (D. C.) 135 Fed. 854, 857; Baltimore Steam Packet Co. v. Coastwise Transportation Co. (D. C.) 139 Fed. 777, 779.

[5, 6] Fifth. The only question remaining for consideration is the amount of damages to be awarded to the libelant and petitioners for the loss of the lives of their intestates, and for the value of the launch. The fixing of these amounts is never free from difficulty, as so many different considerations have to be taken into account. Here the lives of four worthy and respectable colored people were lost. The master and owner of the launch, Alexander Wilkins, was a man of exceptional standing. His employer, the owner of the Core Marine Railway, testified that he knew him well; had employed him for 32 years; that he was a caulker and carpenter, making $3 a day every day; and that he was a man of large experience in handling and navigating launches; that his general character, and as respects sobriety, was as good as any man's could be, and that he never saw him take a drink, or smelled whisky on him; that he was a good man at everything, and an honest man, one that he trusted with his business and money in his absence; that he sold him the launch, and it was worth $1,000. Wilkins was a married man, 45 years of age, in good health, and left a widow and nine children, whose ages ran from 22 years to nine months.

Edward Bishop was 29 years old, and left a widow and three small children. He was a wagoner, earning $2.50 a day, and worked steadily. The two young women were 16 years old; one of them worked as a nurse, and earned $2 a week; the other was not at work.

The court's conclusion is that an award of $7,500 should be made

for the loss of the life of Wilkins, and $600 for loss of the launch, $4,500 for the life of Edward Bishop, and $1,500 each for those of Elizabeth Hix Simmons and Lubertia Howell.